## MIDLAND VALLEY R. CO. v. ADKINS.

No. 1979. Opinion Filed October 23, 1912.

(127 Pac. 867.)

1. STATES—Verdict—Assent of Required Number of Jurors. Where a cause of action arose prior to statehood, but action thereon was not brought until after statehood, a verdict by three-fourths of the jury is valid.

2. CARRIERS—Carriage of Live Stock—Connecting Carriers—Liability. Where an initial carrier agreed to furnish cars to receive cattle for shipment, and the evidence shows that if it had done so the cattle would have made connection with a certain train on a connecting road for the point of destination, but the carrier failed to furnish the cars, on account of which failure the cattle were compelled to stand for twelve hours on the track of the connecting carrier, before they could be forwarded, and the carrier was compelled to unload the cattle for feed and water before they reached their destination, and the cattle sustained extraordinary shrinkage, and were a day late in reaching the market, and the market was lower than it was the day they should have reached it, and it appears that the connecting carrier transported the cattle with reasonable dispatch, the shipper is entitled to recover his entire loss from the initial carrier.

3. SAME—Statutory Provisions. Section 514, Comp. Laws 1909, which provides that "if a common carrier accepts freight for a place beyond his usual route he must, unless he stipulates otherwise, deliver it at the end of his route in that direction to some other competent carrier carrying to the place of address or connected with those who thus carry, and his liability ceases upon his making such delivery," exempts the initial carrier from liability occasioned by the default of the connecting carrier, but does not exempt it from liability for damages occurring on the

connecting carrier, where the connecting carrier is free from fault and the loss was caused by the default of the initial carrier.

4.   **EVIDENCE—Opinion Evidence—Subject-Matter.** Where a witness testified as to his experience in the cattle business, and qualified as an expert as to weights, his testimony as to weights was admissible, though he stated he "guessed" they weighed a certain amount, where his testimony considered together showed that he was giving his judgment based on his experience as a cattleman and his observation of the cattle.

5.   **SAME—Hearsay Evidence—Evidence Founded on Hearsay—Market Price.** A person, who accompanied his cattle to market and sold them on a certain day, may testify from information received that day from commission men in that market, and from reading the market reports in the newspapers, as to the state of the market on the previous day, where he has had experience in shipping and selling cattle.

(Syllabus by Rosser, C.)

*Error from Osage County Court;*
*C. T. Bennett, Judge.*

Action by J. D. Adkins against the Midland Valley Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

*Edgar A. De Meules,* for plaintiff in error.

Opinion by ROSSER, C.   This was a suit by J. D. Adkins against the Midland Valley Railroad Company for damages for failing to promptly furnish cars, and for delay in the transportation of certain cattle. Plaintiff requested the agent at Foraker to have the cars at Wheeler Switch to receive his cattle. Wheeler Switch is a siding on defendant's road where freight is received, but no agent is kept there. The business from there is transacted through the agent at Foraker. He was assured by the agent of the company that the cars would be there at eight o'clock in the morning, and was requested to have his cattle there at that time, so they would make connection with the 11:30 train on the Missouri, Kansas & Texas Railway for Kansas City. He had his cattle there at eight o'clock in the morning, but the cars were not placed until two o'clock in the afternoon. The cars left Wheeler Switch about half past two in the afternoon and did not reach Nelagony, where they were to be transferred to the Mis-

souri, Kansas & Texas Railway, until half past nine at night. The distance between the two places is 40 miles, and the witnesses testify that the run ought to have been made in two and a half hours. The engine which drew the cars was broken down on one side and was hard to start. It would "stop on center" and had to be pushed and pried off. By reason of the delay the cars did not connect at Nelagony with any train over the Missouri, Kansas & Texas Railway, for Kansas City, and had to stand on the track at Nelagony all night. The cattle had to be unloaded at Parsons, Kan., in order to comply with the 28-hour law, and remained there about six hours. They did not reach Kansas City until the second day after they left Wheeler Switch. If they had been started at the time the company agreed to have the cars ready for loading and transported promptly, they would have reached Kansas City for the next day's market. There was a decline in price of 25 cents a hundred from the next day after they were loaded until the second day when they reached Kansas City.

The court instructed the jury that three-fourths of their number could return a verdict. This is assigned as error. The transaction upon which the plaintiff bases his action occurred prior to statehood. The action was not brought until after statehood. It is the contention of the defendant that, as the cause of action arose prior to statehood, it was entitled to a trial under the procedure as it existed at that time, regardless of the fact that the action was not brought until after statehood. This question has already been decided by this court adversely to the contention of the defendant. The leading case is *Independent Cotton Oil Co. v. Beacham,* 31 Okla. 384, 120 Pac. 969. It was there held that three-fourths of the jury could return a verdict in a civil case brought since the admission of the state into the Union, notwithstanding the fact that the cause of action arose prior to statehood. This decision was followed in *C., R. I. & P. R. Co. v. Baroni,* 32 Okla. 540, 122 Pac. 926.

The next assignment of error is the action of the court in overruling the defendant's demurrer to the evidence, and in refusing to instruct the jury to find for the defendant. The evi-

dence showed that the defendant agreed to have cars ready so that the cattle would be loaded at eight o'clock in the morning. The company did not comply with this agreement. It failed to have the cars ready until two o'clock p. m. The engine furnished to haul them to Nelagony was broken down, and seven hours, or nearly seven hours, were consumed in hauling the cars from the point of loading to Nelagony, where they were to be transferred to the Missouri, Kansas & Texas Railway. Why is not the defendant liable? The evidence is clear that if the defendant had complied with its contract the cattle would have reached Kansas City in about nineteen hours from the time they were loaded, and that they would have been on the market a day sooner. It is urged that, notwithstanding the delay on the defendant's road, if the Missouri, Kansas & Texas Railway had taken the cars on with reasonable promptness after they had reached its line, the cattle would not have been damaged. The evidence does not show the schedule of trains on that road, but it does show that it had a train at 11:30 a. m. on the day the cars were loaded that would have taken the cattle, had they been there, and that it had no train that could carry the cattle from the time they arrived at Nelagony until they were taken out the next morning. That road could not be expected to change its schedules to carry cars, especially when it had had no previous notice that they would be delivered to it. *St. L. & S. F. R. Co. v. Vaughan,* 84 Ark. 311, 105 S. W. 573. The defendant had undertaken to furnish the cars at Wheeler Switch. If he had furnished them at the time agreed and carried them with reasonable dispatch, they would have made connection at Nelagony, with a certain train on the Missouri, Kansas & Texas Railway for Kansas City.

Defendant also urges that six hours were lost on the Missouri, Kansas & Texas Railway while the stock was being fed and watered. It is true this occurred on that road, but the necessity was created by the defendant. If it had furnish cars according to its contract, and carried them wtih reasonable dispatch, the cars would have reached Kansas City before the expiration of 28 hours, and it would not have been necessary to unload the cars.

In *Fox v. Boston R. Co.*, 148 Mass. 220, 19 N. E. 222, 1 L. R. A. 702, the syllabus is as follows:

"A carrier who accepts for transportation an article liable to be injured by freezing, under a special contract for delivery to a connecting line by a fixed time, and who negligently delays delivery to the connecting line, will be liable for damages occasioned by freezing on the connecting line, in consequence of such delays, where such freezing was reasonably to be anticipated and was contemplated by the parties.

In the course of the opinion the court said:

"The general rule is that where goods are delivered in the usual way to a carrier for transportation, and there is a negligent delay in delivering them, the measure of damages is the diminution in the market value of the goods between the time when they ought to have been delivered and the time when they were in fact delivered. *Ingledew v. Northern R. Co.*, 7 Gray (Mass.) 86; *Cutting v. Grand Trunk R. Co.*, 13 Allen (Mass.) 381; *Scott v. Boston & N. O. S. S. Co.*, 106 Mass. 468; *Harvey v. Conn. & P. R. Co.*, 124 Mass. 421 [26 Am. Rep. 673]. These cases are put upon the ground that the duty of the carrier is the measure of his liability, that his duty is to carry the goods to the end of his line, and that any future risks to which the goods may be exposed are not within the contemplation of the parties or the scope of their contract. But we think a different rule prevails where the parties make a special contract which provides for certain risks to which the goods are exposed on the connecting line. Thus in the case before us, the parties made a special contract by which the defendant agreed to deliver the apples to the Maine Central Railroad by a fixed time, so that they would arrive in Bangor in the afternoon of the 23d day of February; both parties knew that the apples were not to be sold in Portland, but were to be forwarded to Bangor; and the special contract was made for the purpose of avoiding the danger of the apples freezing on the connecting line. This risk was anticipated and contemplated by the parties, and, if the danger which it was intended to provide against was incurred by reason of the negligent failure of the defendant to perform its contract, it ought to be responsible in damages."

In *Mich. Cent. R. Co. v. Curtis*, 80 Ill. 324, it was held that if by reason of the delay by one carrier in delivering to a second carrier the second carrier cannot, by reasonable effort, transport and deliver trees and shrubbery before they are destroyed by

the cold weather, the first carrier will be liable for the loss while in the hands of the second carrier.

Why does not the same rule apply in this case? The defendant agreed to receive the cattle at Wheeler Switch by a certain time. . If they had been received at that time, and forwarded with reasonable dispatch, they would have made connection at Nelagony with a certain train for Kansas City. This was a lawful contract, lawfully entered into. *Rudell v. Ogdensburg Transit Co.,* 117 Mich. 568, 76 N. W. 380, 44 L. R. A. 415; *T. P. R. Co. v. Nicholson,* 61 Tex. 491; *Stoner v. Chicago G. W. R. Co.,* 109 Iowa 551, 80 N. W. 569; *Deming v. Grand Trunk R. Co.,* 48 N. H. 455, 2 Am. Rep. 267. It was known to the parties, and is a matter of common knowledge, that the cattle would depreciate in condition and· weight during all the time they were in course of shipment. It was also known that under the law they could not remain on cars for more than 28 hours without being unloaded for water and feed. If the cars had been delivered promptly by the defendant, they would have reached Kansas City a day sooner and would not have required to be unloaded. The delay was the fault of the defendant, and it should sustain the loss occasioned thereby.

The defendant relies upon section 514, Comp. Laws 1909, as construed in *St. L. & S. F. R. Co. v. McGivney,* 19 Okla. 361, 91 Pac. 693, and *C., R. I. & P. R. Co. v. Walker,* 29 Okla. 856, 119 Pac. 993, to relieve it from liability in this case. The statute is as follows:

"If a common carrier accepts freight for a place beyond his usual route, he must, unless he stipulates otherwise,· deliver it at the end of his route in that direction to some other competent carrier,·carrying to the place of address or connected with those who thus carry, and his liability ceases upon his making such delivery."

This statute was not intended to reach cases such as the present one. Its purpose was to exempt the initial carrier from liability for the negligence of the connecting carrier. In this case, if the defendant had delivered the cattle in good condition and according to the contract, it would not be liable for damages caused by the negligence of the connecting carrier. But where

the carrier has been guilty of such negligence and breach of contract as caused the freight to be damaged in the hands of the connecting carrier, it will be liable, although the damage does not take place until the freight has reached the hands of the second carrier. Nothing in the cases cited is in conflict with this doctrine. Suppose the case of a delay in freight such as the present one. Suppose that the shipper expects it to be out 24 hours and by reasonable service only two hours of the time would be spent on the initial carrier. But by the negligent delay it retains it twenty hours. No unusual damage has yet been suffered. The shipper counts on the stock being damaged on the trip to a certain amount, and that amount is not exceeded while the goods are in the hands of the initial carrier, and, if they had gone through in the condition they were when received by the connecting carrier, the shipper would have had no claim against any one. The connecting carrier then takes them and gets through in eighteen hours more, and at the end of the trip they are badly damaged, and have also lost a market. The shipper has been injured. Should the connecting carrier stand the loss? That is not justice. The initial carrier has caused the damage just as much as if it had been in its cars all the way. That is about this case.

The next proposition on which defendant relies is that the court erred in admitting certain testimony. It is contended that the court erred in admitting the evidence of witnesses as to the weight of the cattle because they only guessed at the weight. It is the law that verdicts cannot be based on mere conjecture; but the evidence complained of is more than a conjecture, although a portion of the language is capable of that construction. The witness George stated that he helped load the cattle and that he accompanied them to Kansas City. He stated that he was a cattle man, acquainted with the weight of cattle. Then, when asked what they would have weighed when they arrived at Wheeler Switch, replied: "I guess the cattle would have weighed 1,250, something near that." While he said he guessed they would have weighed 1,250, it is clear from the context he was giving his judgment as a cattle man. He was merely using

a somewhat inaccurate expression. The fact that the cattle actually weighed 1,148 in Kansas City, after the confinement in the cars for the length of time shown by the testimony indicates that his judgment must have been pretty good. The plaintiff, when asked about their weight, stated that he could only guess what it was; but, when asked for his best judgment as a cattle man, said: "About 1,250 pounds, I judge they would weigh at that time." He had previously testified to 23 years' experience in the cattle business. The testimony was admissible.

It is further urged that the court erred in permitting the witness to testify as to the state of the market the day before the cattle were sold, which was the day they would have been on the market if they had been promptly forwarded. The plaintiff and the witness George testified as to the market price the day before the cattle arrived in Kansas City, from information they received from commission men and cattle dealers, and also from reading the market quotations in the papers. The admissibilit of this testimony is not entirely free from doubt, but it is believed to be admissible. The witnesses were in the market the next day after the one concerning which they testified, and had the same means of ascertaining the state of the previous day's market that they had of ascertaining even a few minutes previous to the time they came into the market. The opening of the market the day they sold was undoubtedly based to some extent on the state of the market on the previous day. It was in a sense the same market. The market when they sold was a continuation of the previous day's market and so closely connected with it that to know about the one led to some knowledge of the other. The case is not the same as it would be were they testifying to the market some time before. The two days bore almost the same relation to each other as different hours of the day they sold.

The authorities go further than it is intended to go in this opinion. Without intending to approve or disapprove the authorities where they go further than the facts of this case, the following quotations are made and authorities cited to show that this opinion keeps well within the general rule:

In *Cent. R. & B. Co. v. Skellie,* 86 Ga. 686, 12 S. E. 1017, it was held that a witness who had been for years in the business of shipping fruit to New York, and who received from dealers in that city daily quotations by telegrams and circulars, as well as account of sales of fruit he had shipped, could testify from returns of sales he had shipped at a certain time as to the market for fruits at such time. In the course of the opinion the court said:

"We have given considerable time to the consideration of this question, and find that the authorities hold that 'the testimony is admissible. Wharton says: 'As value, in its business sense, consists largely of the opinions of persons familiar with the market, and as these opinions are made up in a measure of what is said by others, hearsay is a primary evidence of value. In proving value, therefore, it is admissible to resort to hearsay.' 1 Whart. Ev. sec. 255. The same is true of market value, so that 'it is no objection to the evidence of a witness testifying as to market value that such evidence rests on hearsay.' *Id.* Sec. 449. Direct testimony as to market value is in the nature of opinion evidence, and necessarily rests upon hearsay. Any one possessing sufficient knowledge or information may express his opinion. It seems that the witness need not be an expert or a dealer in the articles in question, but may testify as to their market value if he has had ample opportunity for forming a correct opinion. *Thatcher v. Kaucher,* 2 Colo. 698; *Lush v. Druse,* 4 Wend. (N. Y.) 313. But where the witness is a dealer in the things whose market value is in question and has had special opportunities for forming a correct opinion, his testimony is admissible as expert evidence. Lawson on Expert Ev. 439; *Alfonso v. United States,* 2 Story 421 [Fed. Cas. No. 188]. The fact that the witness resides at a distance from the market makes no difference, provided he becomes acquainted in the course of business with the market value of which he speaks. Indeed, we could find no case holding that a dealer in certain articles, who received daily quotations from and made sales in a distant city, could not testify as to the market value of those articles at that place, although he was not a resident thereof and was not there at the time inquired about. The large majority of authorities put the admissibility of such evidence upon the ground that the witness is an expert, because of being a dealer in the articles and receiving quotations or reports in the regular course of business from the dealers in the distant place. *Alfonso v. United States, supra; Brackett v. Edgerton,* 14 Minn. 174 [(Gil. 134) 100 Am. Dec. 211]; *Laurent v. Vaughn,* 30 Vt. 90; *Whitney v. Thacher,*

117 Mass. 523. See, also, *Draper v. Saxton,* 118 Mass. 428; *Noonan v. Ilsley,* 22 Wis. 27; *Fennerstein's Champagne,* 3 Wall. 145 [18 L. Ed. 121]; *Cliquot's Champagne,* 3 Wall. 114 [18 L. Ed. 116]; *Three Thousand One Hundred and Nine Cases of Champagne,* 1 Ben. 241 [Fed. Cas. No. 14,012]. Other authorities hold that, while it is hearsay testimony, it is admissible under an exception to the general rule excluding hearsay, as in cases of pedigree, etc. *Smith v. N. C. R. Co.,* 68 N. C. 107. But whether it is hearsay or expert testimony, they all agree in holding it admissible."

This rule is supported by *Hudson v. Northern Pac. R. Co.,* 92 Iowa 231, 60 N. W. 608, 54 Am. St. Rep. 550; *Hoxsie v. Empire Lbr. Co.,* 41 Minn. 548, 43 N. W. 476; *Texas & P. R. Co. v. Donovan,* 86 Tex. 378, 25 S. W. 10; and *Fountain v. Wabash R. Co.,* 114 Mo. App. 676, 90 S. W. 393.

The statement of *Sisson v. Cleveland & T. R. Co.,* 14 Mich. 489, 90 Am. Dec. 252, leaves a doubt as to whether that case is in point, but a statement in *Cleveland & T. R. Co. v. Perkins,* 17 Mich. 296, shows that both these cases support the rule, as also does *Sirrine v. Briggs,* 31 Mich. 443.

It is claimed by the defendant that the verdict was excessive, but an examination of the evidence shows that it was about right. A judgment for a few dollars more would have been supported by the evidence.

The judgment should be affirmed.

By the Court: It is so ordered.