Noonan vs. Ilsley.

## NOONAN VS. ILSLEY.

| 22 | 27 |
| 97 | 69 |

EVIDENCE—*As to value of stock at a specified time—As to conveyance of title— To contradict witness—Of facts not pleaded, affecting damages.*—ESTOPPEL.— ERROR—*Admission of immaterial evidence.*—DAMAGES, *for breach of real covenant.*

1. To prove the value of the stock of a certain railroad on the 22d of June, 1856, it was not error to admit the testimony of a witness who had "dealt extensively in the stock during the summer of 1856," though it did not appear that he dealt therein on the said 22d of June, and his statements were, to some extent, matters of opinion.

2. In an action for the purchase money of land, plaintiff (the vendor) *held* not to be estopped from denying the validity of a prior recorded deed to one K., on the ground that it was never delivered, although it appears that the object of the transaction was to enable him to commit a fraud upon the law by bringing a suit in K.'s name in a federal court.

3. Nor was plaintiff estopped from denying the validity of such deed by the fact that defendant, after discovering the record thereof, amended his answer previously filed herein, so as to set up a total failure of title by reason of such prior conveyance to K. The case distinguished from those in which parties were induced to defend actions by personal communications from the plaintiffs of facts constituting apparent defenses.

4. A judgment will not be reversed for the erroneous admission of immaterial evidence, unless the court can see that the appellant's rights were probably prejudiced by it.

5. A power of attorney from K. to plaintiff, executed *before* such pretended conveyance from plaintiff to K., empowering plaintiff to sell and convey the same land in K.'s name, had no tendency to show that K. claimed the land under plaintiff, nor that the latter was authorized to accept, as K.'s agent, his own deed to K.; and it was rightly rejected as evidence.

6. Evidence is not admissible to contradict a witness as to *immaterial* statements.

7. Defendant having set up a counter-claim for damages for breach of plaintiff's covenants, plaintiff, without having pleaded the facts, might show that defendant, after his purchase, had conveyed the land to a third party, and that he and his grantees had gone into possession.

8. The purchaser of land who has obtained and retained possession under his vendor's deed, can recover only *nominal* damages for a breach of the covenants of seizin and warranty.

APPEAL from the Circuit Court for *Dane* County.

In March, 1856, plaintiff sold to defendant four lots in the city of Milwaukee, for $1,000 in money and ten shares of stock in the Milwaukee & Watertown Railroad, of the nominal value of $100 each; and gave him a deed with covenants of seizin and against incumbrances. Defendant paid the money, and certificates for seven shares of stock, and gave the following due bill for the remaining three shares: "Due to *Josiah A. Noonan* three hundred dollars in Watertown Railroad stock. Milwaukee, March 22, 1856. CHARLES F. ILSLEY." The plaintiff in this action (which was commenced April 30th, 1862,) alleges demand and refusal of the stock on or about the 22d of June, 1856, and that its value at that time was eighty per cent. of its face; and demands judgment for $240, with interest, &c. The answer alleges a breach of the covenant against incumbrances in plaintiff's deed, in that there was, at the time of its execution, and until November 25th, 1857, an outstanding mortgage for $3,872 upon two of the lots in question, (numbered 8 and

12,) with other lands; and that after defendant became aware of the existence of such mortgage, he refused for that reason to deliver the three shares of stock; but that after the discharge of the mortgage, he had always been and still was ready and willing to deliver them, but plaintiff had refused to receive them. It further avers that the alleged cause of action accrued to plaintiff more than six years before the commencement of this suit, and pleads the statute of limitations. It then sets up a counter-claim for damages for the breach of said covenant, alleging that defendant purchased the lots solely for the purpose of re-sale, as plaintiff at the time well knew. Reply, in denial of the counter-claim. By a supplemental answer, defendant alleges, both by way of defense and counter-claim, a breach of plaintiff's covenant of seizin as to two of the lots, being the same two before alleged to have been encumbered. Reply, in denial.

The decision on a former appeal to this court in this cause, will be found in 21 Wis., 138–149. On the last trial (in May, 1867), plaintiff testified, in his own behalf, that he demanded the stock from defendant on the due bill "in the summer of 1856, some two or three months after its date;" but that he had previously, in May or June of that year, sent his clerk to get the stock; that he was acquainted with the value of said stock in March, April, May and June, 1856; did not know that it had any fixed value in the market, but it was selling at from fifty to seventy-five cents as they could find customers; was not as high in the spring of that year as later in the summer and fall. Daniel Newhall, for the plaintiff, testified that he did not remember whether he dealt in said stock in the spring and summer of 1856, but presumed he did; that he was "in the road" at that time; that he knew the value of the stock that summer, but did not remember whether it was in June or July.

"I dealt a good deal in that stock in the summer of 1856; its value was as you could find a customer; we used always to value it at from 60 to 65 cents. I traded some at that time in New York; got 80 cents for it in trade, but called it worth 60 or 65 cents." *Question:* "From your knowledge of its value, what was it worth, in your judgment, on or about the 22d of June, 1856?" *Answer:* "I think 60 to 65 cents was a fair value for it." On cross-examination, he said he did not think he had ever sold any of said stock for cash, and did not know of anybody else selling it for cash; that he did not know any more of its market value than he had already stated; that it was not quoted in the market. *Question:* "When you say that you estimated the value of it at 60 to 65 cents, what do you mean by that?" *Answer:* "I could always realize that for it. I traded in it at that time to the amount of from $50,000 to $60,000 worth, and found I could always realize about that for it." *Question:* "Had it any market value on the 22d of June, 1856?" *Answer:* "Yes; it could always sell for something." *Question:* "Could it sell for cash at that?" *Answer:* "I don't know; did not know of any cash transactions. I know that during the summer, in our board [the board of directors of said railroad company], we always called it worth from 60 to 65 cents, but whether it could have been sold for 50 cents cash I do not know." On his direct examination being resumed, the witness testified that it was "during the summer of 1856" he traded in said stock to the amount of $50,000 or $60,000, as above stated. All the evidence given by this witness on his direct examination, was received against defendant's objection.—The defendant put in evidence a deed of the lots, with covenants of seizin and against incumbrances, executed to him by plaintiff, March 22d, 1856, as alleged in the answer. He also introduced evidence of the relative value of the several

lots at the time of sale, showing that lots 8 and 12 were worth more than the other two. A witness for defendant testified that he was a director of the Milwaukee & Watertown R. R. in 1856, and was acquainted with the value of its stock in May and June of that year, and it was worth not more than 50 cents on the dollar; this was the price from March to June, 1856, both inclusive. On cross-examination, being asked what were his means of knowledge, he said; "I had some stock for sale; held it at 50 cents, and tried to sell it; sold some at that price in trade; was not able to sell any for cash. I know of others of the directors having some, and holding it at the same price. That was the price we all generally held it at. I know of no market value of the stock for cash, at that time." On his direct examination resumed, he stated that he thought his acquaintance among business men and dealers in stock, in Milwaukee, was such that he knew about the sales of this stock and the trades that were made. *Question :* "Could the stock, at the time you have mentioned, have been bought for the price you have mentioned?" *Answer :* "Mine could." *Question :* "Was there any trouble in getting any at that price at that time." *Answer :* "Mine could—I was for selling all the time." These answers were received against plaintiff's objection. James Johnson, for defendant, testified that in 1856 he was president of the Milwaukee & Watertown R. R. Co.; that he could not tell the cash value of the stock on or about June 22d; that he sold some of it that year (about $1,500 worth) for fifty cents; thought this was in the spring or early in the summer. The defendant, as a witness for himself, testified that he knew the value of said stock in May, 1856; it was 55 cents; he bought some at that price May 3, 1856; could not tell whether the price rose or fell after that purchase; his impression was that it fell.

As to the alleged breaches of plaintiff's covenant, it was admitted, 1. That at the time of the conveyance by plaintiff to defendant, there was an outstanding and unpaid mortgage upon the lots conveyed, with other lands, as alleged in the answer, which mortgage was paid by plaintiff and discharged of record, November 25th, 1857. 2. That on the 31st of December, 1851, one Jamison was seized in fee and possessed of said lots 8 and 12. The following were also received in evidence: 1. A deed of said lots, purporting to have been executed by said Jamison, March 19, 1852, and to have been acknowledged in the state of Texas, and the certificate of acknowledgment annexed purporting to be signed by a notary public of ——————— county, Texas; but there was no evidence annexed that the person who took the acknowledgment was a notary, or that his signature was genuine, or that the deed was executed or acknowledged according to the laws of Texas. 3. A quit-claim deed from plaintiff to one Kasson, of lots 8 and 12, executed September 2, 1852, and recorded the next day. 4. A deposition of said Kasson, in which he stated that he never owned or claimed said lots or any part thereof; that if any deed purporting to convey either of them to him was ever executed, it was without his knowledge, and was never delivered to or accepted by him. In reply to the question whether on the 30th of October, 1866, in the presence of certain specified persons as witnesses, he executed a written release to defendant of any claim he might be supposed to have against the latter by reason of the supposed conveyance to witness of said lots, he answered, " I cannot say definitely from recollection; I think I did; I executed some instrument, but its exact contents I cannot remember." The plaintiff, as a witness for himself, testified as follows: " I executed the deed to Kasson, which has been read in evidence. It was never delivered by me to Kasson, or to any other person for him. It never

passed out of my possession, except when I left it for record. I received it from the register's office when it was recorded, and have ever since had, and now have it in my possession. I executed it to enable me to bring actions of ejectment in Kasson's name in the United States court, against squatters on the premises. Kasson lived in the state of New York; he did not know of the execution of the deed." 5. A deed of said two lots from Kasson to plaintiff, made and duly recorded in 1862. 6. A deed of said two lots from defendant to Silkman and Perkins, dated May 1, 1856, the consideration named therein being $2.000. 7. Depositions of said Silkman and one Field, tending to show that Silkman and Perkins and their grantees went into and retained possession of said lots under said deed. 8. An instrument in writing, dated October 30, 1866, purporting to be executed by Kasson under his hand and seal to defendant, and to be witnessed by two subscribing witnesses, but which " contained no certificate or proof of acknowledgment by Kasson, and had no U. S. revenue stamp annexed thereto." After reciting the conveyance from plaintiff to Kasson, and that the same was without consideration, and was never delivered, this instrument purported to release defendant from all claim on account of the matter, and to acknowledge the receipt in full of all claims of Kasson against him for the same. All this evidence, except that numbered 3, was offered by the plaintiff, and was received against defendant's objections. The defendant then offered in evidence a power of attorney from Kasson to plaintiff, executed May 26th, 1851, empowering plaintiff to sell certain lots in the city of Milwaukee, including said lots 8 and 12, but the evidence was rejected.

The court instructed the jury, in substance, that if the first demand for the stock was made within six years before this action was commenced, plaintiff was entitled to damages equal to the value of the stock at the time of the first

demand, with interest; that defendant was entitled to only nominal damages for the breach of the covenant against incumbrances; that if the deed from plaintiff to Kasson was never delivered, it conveyed no title; that putting the deed on record without the knowledge or consent of Kasson did not constitute a delivery; that if said lots 8 and 12 were subsequently re-deeded by Kasson to the plaintiff, and the defendant or his grantees were not kept out of possession by reason of said deed to Kasson being on record, and all claims for damages on the part of Kasson against defendant and his grantees had been released, defendant was only entitled to nominal damages on his counter-claim by reason of said deed being on record.

Verdict for the plaintiff, for $316.38; new trial denied; and judgment upon the verdict; from which the defendant appealed.

*Wells & Brigham,* for the appellant, argued the several objections to the rulings of the court which are referred to in the opinion below. To the point that plaintiff was estopped by the record of his deed to Kasson from denying, against defendant's counter-claim, that he had conveyed the title, they cited *Hall v. White,* 3 Carr. & P., 136; *Presb. Cong. v. Williams,* 9 Wend., 148; *Divoll v Leadbetter,* 4 Pick., 220; *Doe v. Lambly,* 2 Esp., 635; *Price v Harwood,* 3 Camp., 109; 1 C. and H.'s Notes, p. 372, n. 225; 2 id, p. 205, n. 192, and cases there cited. At farthest, the plaintiff should only have been allowed to make such proof on terms saving defendant from all costs incurred in making the counter-claim and defense on that ground. Counsel also contended that the court erred in admitting the release by Kasson to defendant, because it was void for want of a stamp; because it was not acknowledged so as to be read in evidence without proof of its execution, and there was no sufficient proof; and because it had not been pleaded. Graham's Pr., 294; 3 Cow., 75; 7 Johns., 194.

*William F. Vilas,* for respondent, to the point that plaintiff was not estopped from showing that his deed to Kasson was invalid, argued that there was no estoppel by deed, because there *was no deed,* and because such estoppels exist between parties and privies only, and must be mutual (*Wilkins v. Dingley,* 29 Me., 73; *Campbell v. Hall,* 16 N. Y., 575; *Inhabitants of Worcester v. Green,* 2 Pick., 425; *Wood v. Davis,* 7 Cranch, 271; *Paynes v. Coles,* 1 Munf., 373; *Turpin v. Thomas,* 2 Hen. & Mun., 139); nor was there any estoppel *in pais,* because such must be mutual, and the acts or admissions relied on must have been intended to influence, and must have influenced, the party setting them up, to his injury. *Welland Canal Co. v. Hathaway,* 8 Wend., 480; *Clute v. Jones,* 28 N. Y., 280; *Green v. Russell,* 5 Hill, 183. 2. To the point that Newhall's testimony was properly received, counsel cited *Dana v. Fiedler,* 1 E. D. Smith, 463; *Belden v. Nicolay,* 4 id., 14.

PAINE J. There was no error in admitting the evidence of Newhall to prove the value of the stock. Statements as to value are always more or less matter of opinion, except perhaps in questions concerning a market value. But this is one of the established exceptions to the rule prohibiting witnesses from giving their opinions. The value of property cannot be satisfactorily proved in any other way. We think the witness showed sufficient acquaintance with the property, to admit his statements as to its value. He was "in the road," as he expressed it, and he dealt extensively in the stock during the summer of 1856. The inquiry related to the value of the stock on the 22d of June, 1856, and this was bringing the knowledge of the witness as near to the exact time as was practicable. It was entirely similar in its character to the evidence offered by the defendant on the same subject. The defendant himself testified to the

value on the 3d of May, more than a month and a half before the time in question. It would probably be found that in a great majority of cases where witnesses are allowed to give their opinions as to the value of property at a particular time, they would not be able to show a knowledge derived from dealings at that time, but would base their opinions upon transactions occurring at about the time, before and after.

Nor was the plaintiff estopped from denying the validity of his deed to Kasson. Concede that it was a fraud upon the law for the plaintiff to execute that deed and put it upon record for the purpose of bringing suits in the United States court, in Kasson's name: yet if the deed was in fact a nullity for want of delivery, and if the defendant got a good title, notwithstanding that deed, then the fact that the plaintiff had formerly perpetrated a fraud upon the law, is not a sufficient reason why the defendant should not pay for his land. Suppose A sells to B some article of personal property, for which B gives his note. In an action on the note, B could not defend by proving that at some former time an officer had gone to A with an execution, and was about to levy on the property, and that A had told him that he was not the owner of it. The fact that A had perpetrated a fraud on the officer, would have no bearing upon the question whether B ought to pay his note, because B would not have been affected by it. So here the defendant has not been affected by the execution and recording of the Kasson deed. He did not act upon it, and did not know of its existence, as appears from his supplemental answer, until after he had determined to defend against this action, and had served his answer. But his counsel claims an estoppel by reason of the fact that after discovering the Kasson deed, the defendant, relying on it, amended his answer and set up a failure of title. And he relies upon the following cases:

*Hall et ux. v. White*, 3 Carr. & Payne, 242; *Church v. Williams*, 9 Wend., 148; *Divoll v. Leadbetter*, 4 Pick., 220; *Doe ex dem. Eyre v. Lambly*, 2 Esp., 635; and *Price v. Harwood*, 3 Campb., 109. But in all those cases the statement which was held to create the estoppel was a personal communication made by the party estopped to the other party, on a direct application by the latter for information by which to regulate his own conduct in the matter. Here nothing of that kind existed. The defendant did not determine to defend this action at all on the faith of the Kasson deed; because, as already stated, he had served an answer before he learned of that. But even if he had, the record of that deed was not such a fact that he had a right to treat it as a personal communication made by the plaintiff to him upon the subject, for the purpose of enabling him to determine whether or not to defend the action. If he had applied to the plaintiff for information on the subject, and the plaintiff had told him that the title was in Kasson by virtue of that deed, it would have been more nearly like the cases cited. But the record of the deed might have been explained in various ways. Kasson might have re-deeded to the plaintiff, and that deed not been recorded, and yet the defendant would have had as good a right to rely on it as an estoppel in that case as in this.

Suppose a man conveys land with a covenant against incumbrances. The purchaser afterwards finds the record of a mortgage and no release. Could he, relying on that alone, pay the amount of the mortgage to the mortgagee, and bring an action on the covenant, and estop his vendor from showing that the mortgage had been paid and released, though the release was not recorded? Clearly not. And the reason is, that he would have no right to act upon the mere record in such a matter, as he would upon a direct

Noonan vs. Ilsley.

statement by his vendor that the mortgage was a valid outstanding mortgage.

In the remarks above made, distinguishing this from the cases cited, I have assumed that in the case in 9 Wend., 147, the statements relied on as creating the estoppel were made before the action was commenced. The case says they were made at the time of serving the declaration. But if they were made after the service, and the plaintiff had commenced the action before those statements, and without being influenced by them, I do not think the case can be sustained upon principle.

There are other reasons which, I think, distinguish some of those cases from this, but it is not necessary to comment on them further.

Under our statute, the costs in actions at law follow the recovery. And there would be no way in which the plaintiff could be denied the costs of the action, without holding that he was estopped from denying this defense at all. But here there seems no reason to make any distinction between the question of costs and the merits of the defense; because the defendant did not decide to defend the action by reason of this deed.

The release from Kasson seems to have been immaterial. The plaintiff swore that he never delivered the deed to Kasson, and Kasson swore so too, and that he never accepted it, and had no knowledge of it. There was no evidence to the contrary. And upon this evidence the jury could not have found that Kasson acquired any title by that deed. He therefore had nothing to release. And whether the release offered was executed in such manner as to have made it admissible, provided it had been material, it is unnecessary to determine. A judgment will not be reversed for the erroneous admission of immaterial evidence, unless the court can see that the rights of the party were probably prejudiced by it.

Nor was there error in excluding the power of attorney from Kasson and wife to *Noonan*, authorizing him, among other things, to sell and convey these lots. If that power of attorney had been executed after the date of the deed from *Noonan* to Kasson, it would clearly have been admissible as tending to show that Kasson claimed under that deed. But the date of this power of attorney was May 26, 1851, and the plaintiff's deed to Kasson was not made till 1852. Counsel conceded on the argument that this power of attorney had no tendency to show that Kasson claimed under that deed, but held that it should have been admitted because it contradicted Kasson in his general statement that he never claimed title to those lots. He made that statement in answer to questions whether he claimed under the deed from *Noonan*. That was all that was material. If he had formerly owned them before *Noonan* acquired title, that was immaterial, and he could not be contradicted as to immaterial matters.

Nor had this instrument any tendency to prove that *Noonan* was Kasson's agent for the purpose of accepting a delivery of the deed from himself, and thus give it validity. It assumed that the title was in Kasson at the time of its date, and gave *Noonan* authority to convey it for him. But the theory that *Noonan* was Kasson's agent afterwards to accept a conveyance of these very lots to Kasson from *Noonan*, assumes that *Noonan* had acquired the title, an assumption directly repugnant to the power of attorney, and which it had no tendency to show.

Neither was there any error in proving that the defendant had conveyed to Silkman, and introducing the evidence in regard to the possession of the defendant and his grantees. If he acquired possession by the conveyance from the plaintiff, he would be bound to show an eviction by paramount title, in order to get more than nominal damages for

breach of the covenant. This evidence was therefore proper on the question of damages in any event; and the plaintiff was not bound to plead those facts in order to admit them for that purpose.

We think there was no error in the trial, and that the judgment must be affirmed, with costs.

*By the Court.*—Ordered accordingly.