[Crim. No. 1230.   Second Appellate District, Division Two.—June 30, 1926.]

## THE PEOPLE, Respondent, v. BERNARD H. SCHWARZ et al., Appellants.

[1] CRIMINAL LAW—CONSPIRACY TO OBTAIN MONEY AND PROPERTY BY FALSE PRETENSES—SALE OF CORPORATE STOCK—EVIDENCE BEFORE CORPORATION COMMISSIONER—COMPULSION NOT EXERCISED.—In this prosecution against appellants (who are two stock operators and two stock salesmen) under an indictment charging a conspiracy to obtain money and property by false pretenses and representations in connection with the sale of corporate stock, the claim that the two appealing stock operators were compelled to give evidence before the commissioner of corporations which tended to incriminate them has no foundation.

[2] ID.—SERVICE OF SUBPOENA UPON SOME OF APPELLANTS—TESTIMONY BEFORE CORPORATION COMMISSION—USE OF ON TRIAL—IMMUNITY—REVERSAL OF JUDGMENT.—In such prosecution, the judgment of conviction as to the two appealing stock salesmen will be reversed, where they were subpoenaed by the commissioner of corporations and thus compelled to testify under oath as to matters upon which they were subsequently prosecuted and convicted, and the evidence furnished by them embraced much of the data upon which the indictment and judgment of conviction were founded, and by the express inhibitions of the Corporate Securities Act they were guaranteed immunity from prosecution for such matters.

78 Cal. App.—36

[3] Id.—Ministerial and Nonjudicial Officers—Power to Punish for Contempt.—Ministerial and other nonjudicial officers have no power to punish for contempt unless specially so authorized by law.

[4] Id. — Testimony Under Subpoena — Compulsion. — One who is brought into court under a subpoena and testifies pursuant thereto acts under compulsion.

[5] Id.—Testimony of Appellant Given Before Grand Jury—Indictment—Dismissal.—In such prosecution, the trial court properly denied the motions of one of the appealing stock operators for a dismissal of the indictment made upon the ground that the indictment was founded on his testimony given before the grand jury and that his testimony was of an incriminating nature, where he appeared freely and voluntarily as a witness before the grand jury.

[6] Id.—Grand Jury—Witnesses—Indictment—Constitutional Law. There is no constitutional or statutory bar to the appearance of any person before a grand jury as a witness, or to the return of an indictment against any such witness if his testimony or other evidence in the case shall so warrant.

[7] Id.—Representations—Pleading—Indictment.—In such prosecution, the indictment was sufficient, where it in effect charged that defendants conspired to obtain, and did obtain, money from various persons on the false representation that the value of certain bank stock was a specified sum when in fact it was of a lesser value than that represented and when they knew their statements as to its value were false and also on the false representation as to the consolidation of such bank with another bank.

[8] Id.—Conspiracy—Indictment—Corporate Securities Act. — In such prosecution, the indictment being based upon subdivision 4 of section 182 of the Penal Code, denouncing it as an offense for two or more persons to conspire "to obtain money or property by false pretenses," there is no merit in the contention that the indictment was groundless because the nature of the offense charged was a violation of the Corporate Securities Act.

[9] Id.—Corporate Securities Act—Not Bar to Prosecution.—The fact that the purpose of the Corporate Securities Act was to provide penalties for the violation thereof, and that section 13 of that act prescribes penalties for falsely stating the values of corporate stock, did not bar the instant prosecution as the defendants were not charged primarily with having misrepresented, but with having conspired to obtain money by false and fraudulent repre-

---

3.   See 5 Cal. Jur. 924; 6 R. C. L. 516.
6.   See 27 Cal. Jur. 28.

sentations and pretenses as a means of furthering the object of such conspiracy.

[10] ID.—REPRESENTATIONS—FALSITY OF—KNOWLEDGE—EVIDENCE.—In such prosecution, the jury were justified in concluding from the evidence that one of the appealing operators knew the falsity of the statements which he may have authorized the salesmen to make.

[11] ID.—VALUE OF STOCK IN CERTAIN MARKETS—EVIDENCE.—In ˙ such prosecution, the objection to testimony that the bank stock (the value of which appellants were charged with having misrepresented) had certain values in certain markets, which testimony was given in proof of the market value of the stock, goes to the weight of the evidence and not to its admissibility.

[12] ID.—MISTRIAL—DEFINITION OF.—A "mistrial" is one wherein a proper decision would have completed the trial.

[13] ID. — TESTIMONY OF ABSENT WITNESSES UPON FORMER TRIAL— READING TO JURY—CROSS-EXAMINATION—COMPLIANCE WITH STATUTE. In such prosecution, where absent witnesses upon a previous trial of the same issues appeared in open court, in the presence of defendants, who either in person or by counsel cross-examined them, or had an opportunity to do so, all the requirements of the statute were satisfied to permit the reading to the jury of the testimony of such absent witnesses given upon a former trial.

[14] ID.—ABSENT WITNESS — DILIGENCE — DISCRETION. — The question of diligence in searching for an absent witness whose testimony given on a former trial is desired to be read to the jury is left to the sound discretion of the trial court, based upon the facts and circumstances before it; and, in the instant prosecution, there was no abuse of such discretion in permitting the testimony of absent witnesses given on the former trial to be read to the jury.

[15] ID.—ABSENT WITNESSES—SERVICE OF SUBPOENA BEFORE DEPARTURE—EFFECT UPON READING OF TESTIMONY.—In such prosecution, the fact that the absent witness had received a subpoena before he left the jurisdiction did not prevent his testimony given on the former trial from being read to the jury.

[16] ID.—TESTIMONY OF ABSENT WITNESSES—READING OF—NONVIOLATION OF SIXTH AMENDMENT TO FEDERAL CONSTITUTION—TIME OF AMENDMENT.—In such prosecution, the reading of testimony of absent witnesses given on the former trial is not violative of the sixth amendment to the federal constitution, which provides that

14.   See 8 Cal. Jur. 129.
16.   See 8 Cal. Jur. 126.

a defendant in a criminal action is entitled "to be confronted with the witness against him," where the witnesses in question appeared at the former trial and were cross-examined by the defendant; and since the constitution of the United States is the "supreme law of the land," the fact that the ratification of the federal amendment antedates the state constitution or the state statute can afford it no greater force than an amendment thereafter incorporated into the organic law of the land.

[17] Id.—Sixth Amendment—Object of.—The sixth amendment to the federal constitution does not require that all witnesses must personally appear and testify in the presence of a particular jury; its object is to provide a person who is being tried for a public offense full opportunity for cross-examination.

[18] Id.—Accomplice—Instruction.—In such prosecution, an instruction that the question whether certain named witnesses or any other persons not named in the indictment were or were not conspirators, or were or were not indicted in connection with the transactions involved in this case, is wholly irrelevant and immaterial, and must not be considered, did not, as claimed by appellants, proclaim as a matter of law that the witnesses were accomplices.

[19] Id.—Market Value of Stock—Telegrams—Evidence—Instructions.—In such prosecution, telegrams, through which appellants made purchases of the bank stock in question, were competent evidence in determining the market price or value of such stock; and the trial court properly refused requested instructions to the effect that telegrams in evidence should not be considered by the jury in determining the market price of the stock, also that individual sales of stock were not to be considered in determining the market value.

[20] Id.—Verdicts—Judgments.—In such prosecution, the contention that the rendition of separate verdicts convicting four of the defendants, and one acquitting another defendant, and the entry of individual judgments as to each constituted a "miscarriage of justice," cannot be sustained.

[21] Id.—Conspiracy—Judgments.—A conviction of two or more defendants of the crime of conspiracy is not dependent upon a conviction of all.

17. Reading depositions of testimony as violation of right to be confronted with witnesses, see note in 25 L. R. A. (N. S.) 868. See, also, 8 R. C. L. 86.

[22] ID.—VERDICT—EVIDENCE—JUDGMENT.—In such prosecution, it cannot be said as a matter of law that the verdict as to one of the appealing operators was unsupported, or that it was insufficient to sustain the judgment against him.

(1) 16 C. J., p. 406, n. 28.    (2) 16 C. J., p. 95, n. 13; 40 Cyc., p. 2178, n. 61 New.    (3) 13 C. J., p. 53, n. 21 New; 40 Cyc., p. 2156, n. 14.    (4) 40 Cyc., p. 2163, n. 81, 82, p. 2178, n. 61 New.    (5) 28 C. J., p. 810, n. 85.    (6) 28 C. J., p. 810, n. 81 New, 91 New.    (7) 25 C. J., p. 623, n. 86, p. 627, n. 31, p. 636, n. 24.    (8, 9) 12 C. J., p. 559, n. 97 New.    (10) 25 C. J., p. 652, n. 53.    (11) 22 C. J., p. 694, n. 10, p. 733, n. 98.    (12) 40 C. J., p. 1229, n. 4 New.    (13) 16 C. J., p. 757, n. 50, p. 758, n. 55, 57.    (14) 16 C. J., p. 758, n. 57.    (15) 16 C. J., p. 758, n. 55.    (16) 16 C. J., p. 839, n. 76.    (17) 16 C. J., p. 836, n. 39.    (18) 16 C. J., p. 1053, n. 93.    (19) 25 C. J., p. 644, n. 3.    (20) 12 C. J., p. 643, n. 45.    (21) 12 C. J., p. 643, n. 39.    (22) 12 C. J., p. 638, n. 80.

APPEALS from judgments of the Superior Court of Los Angeles County and from orders denying new trials.    Carlos S. Hardy, Judge.    Reversed in part and affirmed in part.

The facts are stated in the opinion of the court.

Max Schleimer, Fred H. Thompson, John S. Cooper and Wm. T. Kendrick, Jr., for Appellants.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General, and Warner I. Praul, Deputy Commissioner of Corporations, for Respondent.

CRAIG, J.—The appellants, together with defendant Donlin, were tried upon an indictment charging them with having conspired to obtain money and property from divers persons by unlawful, false, and fraudulent pretenses and representations. Each of the appellants was convicted and presented a motion for new trial, which was denied, and they appeal from the respective judgments and orders accordingly entered by the trial court.

It appears that Schwarz, Donlin, and one Clark were officers of a corporation known as the Securities Corporation of Southern California (referred to herein for convenience as the Securities Company), which maintained its offices and principal place of business in the city of Los Angeles,

and that they conducted a stock brokerage business for some time under the corporate name, but later operated under the name of Harry C. Weist.

Stating the offense as alleged in the indictment, and as shown by the evidence, it appears that through the operation and agency of the Securities Company, and Weist, as brokers and dealers respectively in shares of corporate stock, salesmen were employed to solicit customers and interest them in the purchase and sale of shares of the capital stock of the Standard Oil Company of California, and of other well-recognized corporations. Schwarz agreed to finance the business and Weist agreed to obtain a stock broker's license, and to invest $6,000 in the capital stock of the Securities Company; it was also understood and agreed that the profits of the business should be equally divided between Schwarz, Weist, and Donlin. Weist procured a broker's license, was elected vice-president of the Securities Company and entered into active promotion and operation of the business with Schwarz. All orders and confirmations were executed upon stationery bearing the headings "Harry C. Weist, Broker," and "Harry C. Weist, Investment Banker and Broker," and funds received by Weist were turned into the accounts of the Securities Company, which in turn purchased shares of capital stock of Midland Trust and Savings Bank of St. Paul. Schwarz and Weist each had a desk in and occupied the same office of the suite. The former made purchases and the latter effected sales of various stocks by methods which will be more particularly described elsewhere in this opinion; Weist instructed salesmen, and both he and Schwarz signed checks, though Schwarz apparently assumed control of the business and attended to the hiring and discharging of employees of the company.

Appellants Frankfort and Goldner were stock salesmen in the employ of the company, the former having been hired by Schwarz and Weist, and the latter by Schwarz. Goldner received a salary of about $2,500 per year and commissions, and Frankfort was paid a salary of $2,400 to $2,500.

It appears that the major portion of stock sales to Los Angeles customers was initiated by means of a somewhat extensive and persistent telephone system utilized by Schwarz prior to the advent of Weist in the enterprise, and by the salesmen thereafter employed and instructed by them.

It was testified that appellants Frankfort and Goldner, respectively, telephoned from the offices of the Securities Company to people whose names were obtained from directories and advertising concerns, informing them that the Standard Oil Company of California had a large surplus of oil and money and that substantial dividends would soon be declared. The salesmen thus made acquaintances, secured appointments and ultimately met many people having funds to invest, whom they induced to purchase the Standard Oil stock at the current market price, usually payable in installments. Thereafter the same salesmen called the purchasers on the telephone and represented to them that their Standard Oil stock was "going down," that there was an impending collapse, and that no dividend would be paid. It appears that while Frankfort was thus advocating sales, Goldner was sounding the alarm of a threatened "collapse" of the same stock, and *vice versa*, each using the telephones of the same suite of offices.

In the meantime Schwarz was purchasing stock of the Midland Trust and Savings Bank of St. Paul at $2.30 to $4.80 per share with the funds of the Securities Company. Frankfort and Goldner represented to purchasers of Standard Oil stock that the Midland stock was a valuable investment at $12.50 per share, and persuaded them to exchange their holdings for the latter at that price. It thus appears that the Standard Oil stock sold by the concern was repurchased by its own customers, the cheaper stock was given them therefor at a value of $12.50, and the Standard Oil stock was in turn again sold to new customers at market price, in the face of an "impending collapse" in value of the latter security.

Each of the appellants contends that he was compelled to furnish to the commissioner of corporations self-incriminating evidence during the commissioner's investigation of their affairs, prior to the trial, and that he was therefore immune from prosecution under the indictment in this case. It is asserted that books, records, and papers of Schwarz, Weist, and the Securities Company were seized by the commissioner, and that Frankfort and Goldner were compelled to testify at such investigation.

[1] It appears that previous to the institution of the criminal proceedings here under consideration one Floyd L.

Eddy filed with the corporation commissioner a complaint
against appellant Harry C. Weist, as a broker. Upon the
hearing conducted by the commissioner in *Eddy* v. *Weist*,
appellant Weist testified voluntarily, but Schwarz did not
testify. One Bradley, an accountant, whom Schwarz had
caused to audit Weist's accounts, testified from data which
he gathered from the books and records of the brokerage
business.involved in this prosecution, and stated that all the
information, records, and assistance afforded him during his
investigation were furnished voluntarily by Schwarz and by
the commissioner of corporations. There is no evidence or
offered evidence before us tending to indicate that the com-
missioner seized, or compelled any of the parties to furnish,
the books, records, or documents as insisted by appellants.
Hence the claim that appellants Schwarz and Weist were
compelled to give evidence before the commissioner which
tended to incriminate them has no foundation. Appellant
Schwarz also sought to interpose a plea in abatement upon
the same grounds, and assigns as error an adverse ruling of
the trial court as to such plea. We know of no authority
for pleas in abatement in criminal cases. Section 1016 of
the Penal Code specifies the pleas which are recognized in
this state; but in any event, as we have said, these appel-
lants were not compelled to incriminate themselves before
the commissioner. This point, therefore, requires no further
attention.

[2] Motions to quash the indictment in the instant case
were presented, at which time the reporter's transcript of
the proceedings in *Eddy* v. *Weist* was introduced, and is
brought up with the record upon these appeals. It appears
therefrom that appellants Frankfort and Goldner were sub-
poenaed, called as witnesses and examined at length by the
commissioner. It is conceded by respondent that they ap-
peared and testified pursuant to the commissioner's sub-
poena. Their testimony was given over strenuous objec-
tions, and was followed by motions to strike it out, which
were denied. Frankfort and Goldner testified that at the
special instance and request of Weist and Schwarz they ob-
tained customers by telephone, sold them stock which they
later persuaded them to exchange for cheaper shares, in the
manner heretofore related. Frankfort testified that he never
had any independent knowledge of the worth of the stocks

which he sold, but that Standard Oil was always sold first,
and that the same buyers were thereafter induced to ex-
change the Standard stock for Midland bank stock, though
he knew that the latter was not a better investment; that
he never sold the Midland stock for less than $12.50 during
the time that the record shows it to have fluctuated between
$2.30 and $4.80 per share. Goldner testified that he was
"back room manager," in charge of a crew of salesmen; that
at the same time he advocated exchanges of Standard oil
stock by customers for Midland shares, upon the representa-
tion that the former was going to "break," he was selling
the same Standard Oil stock to others at the full price.

The evidence furnished by Frankfort and Goldner em-
braced much of the data upon which the indictment and
judgment in the instant case were founded. It therefore
becomes obvious that they appeared before the corporation
commissioner in response to his subpoena, and testified
under oath as to the matters upon which they were subse-
quently prosecuted and convicted. The respondent does not
attempt to dispute this fact, but contends that they were
not immune from prosecution for the reason that the com-
missioner has no power or authority to *compel* a person
to give evidence which may tend to incriminate him. Coun-
sel for respondent rely upon chapter 2, title III, part IV,
of the Code of Civil Procedure, which provides the method
for production of evidence before a court or upon the tak-
ing of a deposition. It is argued therefrom that for any
disobedience of a subpoena, or refusal to testify, the corpo-
ration commissioner could only "cite" the witness for con-
tempt.

We think this contention is untenable. The commissioner
is by the terms of the Corporate Securities Act (Stats. 1917,
p. 673) clothed with authority to issue subpoenas requiring
witnesses to appear before him to testify and furnish docu-
mentary evidence. Section 17 of said act provides that no
person shall be excused from so testifying or furnishing
evidence upon the ground that it may incriminate him, and
section 14 further provides that every person who "wilfully
violates, or fails, omits, or neglects to obey, observe, or
comply with any order, permit, decision, demand, or require-
ment, or any part or provision thereof, of the commissioner
under the provisions of this act, is guilty of a public of-

fense and shall be punished by imprisonment in the state prison not exceeding five years, or in a county jail not exceeding two years, or by a fine not exceeding five thousand dollars, or by both such fine and imprisonment.'' [3] Ministerial and other nonjudicial officers have no power to punish for contempt unless specially so authorized by law. (*People* v. *Latimer,* 160 Cal. 716 [117 Pac. 1051],) But penalties are provided by this statute for violations of the commissioner's orders.

The commissioner's subpoenas by which appellants were summoned before him were addressed to the witnesses and recited, in part: ''You and each of *you are hereby required to be and attend as a witness* before E. M. Daugherty, Commissioner of Corporations of the State of California, . . . on Monday, the 28th day of July, 1924, at the hour of 10 o'clock A. M., in the above-entitled matter. For failure to so attend, you will be deemed guilty of contempt and *liable to the penalties provided by the act* of the Legislature,'' etc. The act is mandatory; a witness may not refuse to appear or to testify upon the ground that his evidence might incriminate him, and it is made a public offense, punishable by fine or by imprisonment for one day to two or five years, in a county jail or penitentiary, as the case may be, for any person to violate the specific provisions of the act, or ''in any other respect'' to fail or refuse to obey any lawful order, demand, or requirement of the commissioner of corporations. But section 17 of the act further provides: ''No person shall be prosecuted, punished, or subjected to any penalty or forfeiture for or on account of any act, transaction, matter, or thing concerning which he shall have been so compelled to testify under oath, or to produce such documentary or other evidence; . . . ''

[4] The weight of authority clearly supports the proposition that one who is brought into court under a subpoena and testifies pursuant thereto acts under compulsion In *People* v. *Courtney,* 94 N. Y. 490, 493, it was said: ''The Constitution primarily refers to compulsion exercised through the process of the courts,'' and not to the supposed moral coercion which impels a person to testify lest adverse inferences might be drawn from his silence. In *Boyd* v. *United States,* 116 U. S. 616 [29 L. Ed. 746, 6 Sup. Ct. Rep.

524], it was said: "Constitutional provisions for the security of person and property should be liberally construed. A close literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against all stealthy encroachment thereon. Their motto should be *obsta principiis*."

And in *United States* v. *Kallas*, 272 Fed. 742, 752, it was said, further:

"How can it be said that, if a court required an accused to answer upon the witness chair, with the alternative of going to jail if he refused, it was such compulsion as to invalidate the evidence so obtained, and, at the same time, that a prisoner questioned in jail by his captor was not compelled to give evidence against himself?

"Such a course would be to very nearly, if not quite, blind oneself as to what constitutes compulsion. As above pointed out, the compulsion forbidden by the amendment—or at least included in its prohibition—is compulsion exercised through the process of the court. The commitment by which the petitioner in the present case was held in jail is no less a compelling process than were he in court and ordered upon the witness chair for examination. . . . While it may be that many know of their rights, and, even when in prison, have the will and courage to stand upon them, there certainly are others who do not."

In *In re Simon*, 297 Fed. 942 [34 A. L. R. 1404], it was contended that a bankrupt who had failed to obey a subpoena was not guilty of having violated an order of court. But it was said by the circuit court of appeals: "It cannot be denied, however, that a subpoena is a writ. . . . It will not be denied that a writ is a mandatory precept issued by a court, commanding the person to whom it was addressed to do or refrain from doing some act therein specified. Because it is mandatory, and is issued by a court, it is an order of the court. . . . The time was when a witness could not be compelled to go to court and testify, and if he attended and gave testimony his action was thought to bear the semblance of maintenance, and he ran the risk, if he came forward to testify, of being afterwards sued for maintenance by the party against whom he had

spoken. . . . *A subpoena is a writ or process, and is manda-*
*tory in its nature, being a positive command.* A writ of
subpoena, like a writ of *scire facias, fieri facias, habeas cor-*
*pus, certiorari, supersedeas,* and the various other writs, 'are
all commands or orders of court that something be done.' . . .
In *Burns* v. *Superior Court,* 140 Cal. 1, 3 [73 Pac. 597, 598],
the court said that the very etymology of the word 'sub-
poena' signified 'an order with a penalty for disobedience.'
In the case of *Scott* v. *Shields,* 8 Cal. App. 12 [96 Pac.
385], a subpoena is said to be: 'A writ or order directed
to a person and requiring his attendance at a particular
time and place to testify as a witness.' "

The California cases cited in the foregoing quotation in-
volved questions of *certiorari* and contempt, and therefore
are dissimilar from the one here presented. But they are
in harmony with the consensus of general authorities that
a subpoena is a writ, an order, for the disobedience of
which the person named therein may be punished accord-
ing to the expressed will of the legislature.

It has been suggested that the benefit of the immunity
clause is not available to these defendants because they failed
to "claim the privilege." It is obvious, however, that under
such statutes there is no privilege. In *Bradley* v. *Clarke,*
133 Cal. 196 [65 Pac. 395], the supreme court construed an
identical provision in the Purity of Elections Law. (Stats.
1893, p. 12.) It was there said: "If the matter sought to
be elicited by the questions was matter embraced within the
purview of any of the sections . . . , and if with the de-
fendant as a 'person offending' the witness himself was
also a 'person offending,' then by the express provisions of
section 32, and by the authority of this court in *Ex parte*
*Cohen,* 104 Cal. 524 [43 Am. St. Rep. 127, 38 Pac. 364,
26 L. R. A. 423], the witness could not claim immunity,
and should have been compelled to testify."

We think, therefore, that the appellants Frankfort and
Goldner were "compelled to testify under oath" concern-
ing the acts, transactions, matters, and things constituting
the offense alleged in the indictment herein, and that by
the express inhibitions of the statutes they were thus guar-
anteed immunity from prosecution therefor. For the rea-
sons stated the judgments, as to these two appellants, must
be reversed.

[5]    The point is attempted to be made that the indictment was found upon the testimony of appellant Schwarz before the grand jury, and that if the business which he conducted was illegal, having answered all questions propounded to him by the district attorney during such inquisition, his testimony was of an incriminating nature, and that the indictment was null and void. It is asserted that this defendant was subpoenaed, sworn as a witness and examined before the grand jury, and that if he incriminated himself the indictment should have been dismissed. It is stated in the brief of this appellant that a motion was made in his behalf to "quash or dismiss the indictment on the ground that it was found on his testimony before the grand jury" before the trial, was renewed after the case was called for trial, after the jury was impaneled and before they were sworn, at the close of the People's case, and "after the close of the whole case." We have examined the record thoroughly. The appellant seems to have appeared freely and voluntarily as a witness before the grand jury, and we think that each of his motions for dismissal of the charges upon this ground was properly denied.

It is sufficient to quote from the record of the proceedings before the grand jury, which was introduced in evidence by the appellant Schwarz. Answering questions put to him the following statements by Schwarz indicate his attitude in testifying: "A. If I may say just a few words? . . . When I came here, I came from Mr. Youngworth's office, and Mr. Youngworth told me if I was given the opportunity to testify here that I should do so." In reply to another question he said: "A. I am perfectly willing to testify and tell my side of the story, but it would be necessary for me to bring another party here from whom I bought the stock. . . . " Schwarz thereupon testified at some length without hesitation or objection. It is not disclosed by the record that he appeared or gave evidence before the grand jury under any sense of compulsion or duty to the state, but rather that, if given freely and voluntarily, his version would tend to exculpate him. As was said by the supreme court in *People* v. *Page,* 116 Cal. 386, 392 [48 Pac. 326], quoting with approval from *People* v. *King,* 28 Cal. 273: "It is only necessary to say that we know of no rule of law which made it illegal for him to testify if

he felt inclined to do so, nor do we know of any rule of law which makes the voluntary testimony of the defendant before the grand jury a ground for setting aside the indictment." [6] Numerous authorities holding that the constitutional right to trial by jury and like guaranties cannot be waived are cited on behalf of appellant, but we are unable to see how such rule has any application here, since there is no constitutional or statutory bar to the appearance of any person before a grand jury as a witness, or to the return of an indictment against any such witness if his testimony or other evidence in the case shall so warrant.

[7] Nor is there merit in the contention that the indictment did not charge false representations as to known facts, but merely expressions of opinion. It is argued for reversal that the allegations of the indictment amount to no more than accusations that the defendants stated merely the probable future value of the Midland stock, which consisted of familiar artifices of salesmanship known as "puffing," and therefore that no offense was charged. We think counsel have misconstrued the language of the indictment. It was alleged that the defendants conspired to obtain from various named persons divers sums of money in excess of $200, by unlawful, false, and fraudulent pretenses and representations; that in furtherance of such conspiracy they represented that the Midland stock was then and there of the value of $12.50 per share, whereas in truth and in fact said stock was at no time worth more than $5 per share; that the defendants did then and there by such false representations obtain money from said persons, well knowing that their statements as to value were false and untrue. Other allegations of the indictment charged false representations as to the consolidation of the Midland Company with another bank, with equal precision and detail. This constituted a direct charge of conspiracy to obtain, and of having actually obtained, money, by false and fraudulent representations and pretenses, and was sufficient.

[8] The fourth point advanced by appellants is that the indictment was groundless because the nature of the offense charged was a violation of the Corporate Securities Act, and that since said act is not mentioned in section 182 of the Penal Code, this prosecution is barred by section 183,

which provides that "No conspiracies, other than those
enumerated in the preceding section, are punishable crimi-
nally." In *Doble* v. *Superior Court*, 46 Cal. App. Dec. 434
it was ruled that a conspiracy to violate the Corporate
Securities Act was not a crime, but the supreme court subse-
quently passed upon the same case, and held otherwise.
(*Doble* v. *Superior Court*, 197 Cal. 556 [241 Pac. 852].) It
was there expressly held that the second penal paragraph of
section 182 of the Penal Code imposes a penalty "for a con-
spiracy to commit any and all misdemeanors, whether defined
by the Penal Code or by any other statute, and for conspira-
cies to commit all felonies which are *defined and penalized by
some law other than the Penal Code.*" (Italics in original.)
Nevertheless, it should be borne in mind that this proceeding
was not founded upon an alleged violation of, or conspiracy to
violate, any of the provisions of the Corporate Securities
Act. The indictment was based upon subdivision 4 of sec-
tion 182, denouncing it as an offense for two or more per-
sons to conspire "to obtain money or property by false
pretenses."

[9] Another theory upon which the validity of the in-
dictment is challenged is that it charged the defendants, as
brokers and dealers, in the buying and selling of stocks,
with having misrepresented the value of the stock of the
Midland Company, and that said company was then in the
process of consolidation. It is argued therefrom that since
the purpose of the Corporate Securities Act was, as entitled,
" . . . to provide penalties for the violation thereof," and
since section 13 of that act prescribes penalties for falsely
stating the values of corporate stock, it necessarily was all-
comprehensive, and that infractions of its provisions were
not cognizable by the provisions of the Penal Code. We are
also reminded that this statute embraces the clause, "All
acts and parts of acts *inconsistent* with the provisions of
this act are hereby repealed." This argument is not only
founded, as we have seen, upon an erroneous premise as to
the crime charged, but it is conceded that the Corporate
Securities Act is a continuation of the Investment Com-
panies Act (Stats. 1913, p. 715), which in itself is a cogent
reason for the existence of the repealing clause in the later
legislation. Appellants do not attempt to assert that section
182 of the Penal Code was thereby repealed, nor do they

indicate any provision of the act in question with which it could be said that said section is inconsistent. The fact that appellants were not charged primarily with having misrepresented, but with having conspired to obtain money by false and fraudulent representations and pretenses as a means of furthering the object of such conspiracy, is entirely ignored by their argument, but it constitutes a complete answer to their contention.

[10] On behalf of the defendant Schwarz it is insisted that the People failed to make any showing tending to prove that he knew of the falsity of statements which he may have authorized the salesmen to make. In addition to what has already been said of the facts in this case, there is an abundance of circumstantial evidence, which alone would suffice to sustain the verdict and the judgment, if believed by the jury. (*People* v. *Flynn,* 73 Cal. 511 [15 Pac. 102].) It also appears without contradiction that Schwarz was the instigator and chief executive of the Securities Company's business, and that he enlisted the services of Weist, who thereafter collaborated with him, and that the two promoted the enterprise along the lines previously described; that Schwarz made careful and extensive inquiries, by telegraph and otherwise, as to the value of Midland stock, and obviously purchased it upon information so acquired; that at no time was he informed that it was worth more than $4.80 per share, although Weist and the salesmen at all times represented this same stock to be worth $12.50, and sold it to all comers upon such representations, at the latter figure. The financial statement of the Midland Company received by Schwarz and offered in evidence in his behalf contains information which is in itself sufficient to establish Schwarz' knowledge of the falsity of the statements in question. The highest value that appellant claims that this self-serving statement could possibly warrant as to Midland stock is $11.65, and some of the salient recitals contained therein are significant. It informed appellant, and other Midland stockholders to whom it was transmitted, that the assets of the company were *believed* to be sound, and that "there will eventually be little, if any loss on any of them, but the real fact is, that some of them cannot be realized on at the present time, either as to principal or interest"; "a few have resulted in absolute loss which had to be

charged off. We do not expect that very much more will
have to be charged off . . . '' Again, one of the false rep-
resentations which are charged to have been made by the
conspirators is that the Midland Company was in process of
consolidation with another institution. This was flatly con-
tradicted by the testimony of the witness Strickler, who was
vice-president of the Midland Company. While the appel-
lant was in possession of such a statement as that just men-
tioned, which at most might instil a sense of hope rather
than confidence, and of other information as to value, he was
purchasing the stock in question as low as $2.30 per share,
and yet his forces were actively campaigning for buyers of
the same stock at $12.50. There is no evidence anywhere
in the record, so far as we have been able to ascertain, that
this stock ever had a value of $12.50 per share, though
Schwartz was consistently receiving the latter price for stock
which at times cost him little more than one-fourth such
figure. We think the jury were wholly justified in conclud-
ing from the evidence, as they apparently did do, that
appellant knew that the price or value of Midland stock
was misrepresented.

[11] It is objected that the indictment charged a con-
spiracy to defraud by the false representation that the market
value of Midland stock was $12.50 per share whereas it was
then and there in fact worth $5 per share; that the People
failed to prove the market value *as alleged,* and that the
judgment should therefore be reversed. It is further argued
that the market value of unlisted stock is the book value,
or the price at which it may be bought in the nearest market.
The indictment did not so charge. It alleged that said stock
was not worth in excess of $5 per share. While the People
made no proof as to the actual value based upon assets and
liabilities of the Midland Company, the financial statement
of that corporation introduced as a part of the defense
showed affirmatively that its actual value did not exceed
$11.65. However, there is considerable evidence in the
record to sustain the contention that the stock had a market
value in Minneapolis, and that in that market it was only
$2.30 to $4.80. The witness Parks, who qualified as an
expert, being a broker from Minneapolis, and familiar with
the stock in that market, testified that during the period
in which Schwartz bought and sold this stock the minimum

market value was $2.30 and the maximum was $4.50. In addition to this there is the undisputed evidence of many purchases by these defendants in Chicago and Minneapolis at approximately these latter figures. Objections to this evidence as proof of the market value of the stock goes to its weight and not to its admissibility.

It appears that the People were permitted to read to the jury the testimony of various absent witnesses, given upon a former trial of this case. It is contended that this was error for the reason (1) that the latter was not a "former trial" within contemplation of section 686 of the Penal Code, but that it was a "mistrial"; (2) that diligent search was not shown to have been made for the witnesses during the second trial, and (3) that as to one such witness it was admitted that he had left the jurisdiction after having been served with a subpoena. The legal distinction, if any there be, between a "former trial" and a "mistrial," as applied to the instant controversy, is not indicated by appellants, and we are aware of none. [12] A "mistrial" is one wherein "a proper decision would have completed the trial." (*Stern* v. *Wabash R. Co.*, 52 Misc. Rep. 12 [101 N. Y. Supp. 181] ; *Fiske* v. *Henarie,* 32 Fed. 425, 427.) [13] It is not denied that the witnesses in question, upon the previous trial of the same issues appeared in open court, in the presence of the defendants, who either in person or by counsel cross-examined them, or had an opportunity to do so. This being true, all the requirements of the statute were satisfied. It was testified that certain of the witnesses who resided and maintained businesses outside of this state were known to have left the jurisdiction, and that at the time of their departure they stated that they would not return; that process servers thereafter called at the local hotel where they had been, and were there informed that the witnesses had gone. It appeared that these witnesses were not expected for the retrial of the case, although an attempt was made to serve them. The trial court concluded that under the circumstances a sufficient showing of diligence had been made to render their previous testimony admissible. [14] The question of diligence in such cases is left to the sound discretion of the trial court, based upon the facts and circumstances before it, and we think there was no abuse of such discretion in this instance. (*People* v. *Ramos,* 52 Cal.

App. 491 [199 Pac. 544].)     **[15]**     Again, the mere fact that
the witness Rayburn had received a subpoena before he left
the jurisdiction is not material.     We know of no rule, and
are cited to none, requiring that the service of process may
be said to render incompetent testimony otherwise admissible
under the provisions of the statute.     We find no error in
the rulings upon these objections.

**[16]**     Upon the trial objections were interposed to the
testimony last mentioned, and it was followed by motions
to strike, upon the ground that the statute of this state
which authorized its reading was unconstitutional.     Ap-
pellants advanced the somewhat novel argument that the
sixth amendment to the constitution of the United States
provides that a defendant in a criminal action is entitled
"to be confronted with the witnesses against him"; that
article I, section 3, of the constitution of the state of Cali-
fornia declares that "the constitution of the United States is
the supreme law of the land"; that the sixth amendment to
the federal constitution was in full force and effect at the
time of the adoption of the California constitution in 1879,
wherefore, it is said, the amendment to the federal constitu-
tion must be deemed a part of the constitution of Cali-
fornia, and hence that the legislature "had no jurisdic-
tion to enact that part of subdivision 3, section 686, of
the Penal Code, which permits the reading of the testi-
mony of a witness given on a former trial in a criminal
action, because that provision is in direct conflict with the
provision of the sixth amendment" quoted.     It is not even
suggested that the witnesses in question did not appear at
the first trial or were not cross-examined upon all the issues
concerning which they gave direct evidence.     It must be con-
ceded that at that time they confronted the defendants, and
that therefore their testimony, when read to the second
jury, complied with all the requirements of the sixth amend-
ment to the constitution of the United States.     **[17]**     This
amendment does not require that all witnesses must person-
ally appear and testify in the presence of a particular jury.
Its object is to provide a person who is being tried for a
public offense full opportunity for cross-examination, and this
right these appellants admittedly had exercised.     Counsel
freely admit that their argument is confronted with nu-
merous decisions holding that section 686 is constitutional,

but they assert that in those cases the courts overlooked the fact that the constitution of the United States was in force when the state constitution was adopted. However, since the constitution of the United States is the "supreme law of the land," the fact that the ratification of an amendment antedates the state constitution or a state statute can afford it no greater force than an amendment thereafter incorporated into the organic law of the land. As was said in *People* v. *Wilson,* 26 Cal. App. 336 [146 Pac. 1048] : " 'The fifth and sixth amendments of the Constitution of the United States are restrictive of the powers of the federal government and not restraints upon the states.' (*Davis* v. *Texas,* 139 U. S. 651, 653 [35 L. Ed. 300, 11 Sup. Ct. Rep. 675] ; *Brown* v. *New Jersey,* 175 U. S. 174 [44 L. Ed. 119, 20 Sup. Ct. Rep. 77].) We are of the opinion that this conclusion is not affected by the statement contained in section 1897 of the Code of Civil Procedure, that the written law of this state is 'contained in its constitution and its statutes, and in the constitution and statutes of the United States.' "

[18] It is said that the instruction that "the question whether the witnesses Clark and Farrell or any other persons not named in the indictment, were or were not conspirators, or were or were not indicted in connection with the transactions involved in this case is wholly irrelevant and immaterial," and must not be considered, was prejudicial error because Clark was at one time secretary and treasurer of the Securities Company, and was, therefore, an accomplice. The jury was properly instructed as to their duty in weighing the testimony of witnesses, which was the only material consideration. The existence of the indictment, or the fact that others may or may not have been accused of the same offense, had no bearing upon the question of guilt or innocence of the defendants then before the court. The instruction did not, as claimed by appellants, proclaim as a matter of law that the witnesses were accomplices.

[19] Certain instructions which were requested by the defendant Schwarz and refused were to the effect that telegrams in evidence should not be considered by the jury in determining the market price of the stock, also that individual sales of stock were not to be considered in determining the market value. We are cited to no authority sustain-

ing these propositions. Many authorities are cited which hold that certain other evidence is admissible and proper in measuring market value. In some of the cases cited by appellants it is said that where stocks are unlisted it is proper to prove the market value by showing the assets of the corporation and deducting therefrom its liabilities, but in none of these decisions is there any statement to the effect that other evidence is not admissible, or, indeed, sufficient. On the other hand, there is an abundance of authority upholding the use of evidence of actual sales and offers for sale to establish "market value," or "market price." In *Muser* v. *Magone*, 155 U. S. 240 [39 L. Ed. 135, 15 Sup. Ct. Rep. 77, 81], it was held that "market value" is the price which dealers are willing to receive and purchasers are compelled to pay. To the same effect are *Sanford* v. *Peck*, 63 Conn. 486 [27 Atl. 1057]; *Murray* v *Stanton*, 99 Mass. 345, 348; *Palmer* v. *Penobscot L. Assn.*, 90 Me. 193 [38 Atl. 110]; *K. C. W. & N. R. Co.* v. *Fisher*, 49 Kan. 17 [30 Pac. 111]; *Dady* v. *Condit*, 188 Ill. 234 [58 N. E. 900]; *Pittsburg V. & C. R. Co.* v. *Vance*, 115 Pa. 325 [8 Atl. 764]. Further, transactions had at about the time in question may be shown. (*Noonan* v. *Ilsley*, 22 Wis. 27.) Hence, the telegrams were competent, as purchasers of Midland stock by the defendants were made through them as a medium.

[20] It is further contended that the rendition of separate verdicts convicting four of the defendants, and one acquitting the defendant Donlin, and the entry of individual judgments as to each, constituted a "miscarriage of justice." We are not cited to any authority or given a valid reason for so holding, and we are unaware of any possibility of advantage to appellants from a consolidated verdict finding them guilty of the offense charged. In all jurisdictions where to our knowledge the question has been decided, separate verdicts have been sustained. (*Davis* v. *State*, 8 Ala. App. 147 [62 South. 1027]; *Woodward* v. *State*, 84 Ark. 119 [104 S. W. 1109]; *State* v. *Cotterel*, 12 Idaho, 572 [86 Pac. 527]; *Meadowcroft* v. *People*, 163 Ill. 56 [54 Am. St. Rep. 447, 35 L. R. A. 176, 45 N. E. 991]; *Hughes* v. *State*, 65 Ind. 39; *Arnold* v. *Commonwealth*, 21 Ky. Law Rep. 1566 [55 S. W. 894]; *State* v. *Johns*, 259 Mo. 316 [168 S. W. 587].) [21] It is too elementary to require

the citation of authority that a conviction of two or more defendants of the crime of conspiracy is not dependent upon a conviction at all.

Aside from the questions heretofore considered, it is said in behalf of the defendant Weist that he was merely a victim of circumstances, and that the evidence was insufficient to convict him of conspiracy with his codefendants. [22] We cannot say as a matter of law that the verdict of the jury was unsupported, or that it was insufficient to sustain the judgment. It at once appears quite obvious that many of the circumstances which resulted in his conviction were of his own ingenious creation in confederation with the defendant Schwarz.

There are no other alleged grounds of appeal which merit attention.

The judgments as to appellants Frankfort and Goldner are reversed.

As to appellants Schwarz and Weist the judgments and orders appealed from are affirmed.

Finlayson, P. J., and Works, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on July 30, 1926, and a petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 26, 1926.