[Sac. No. 4622. In Bank.—February 27, 1934.]

ORIGINAL MINING AND MILLING COMPANY (a Corporation), Respondent, v. SAN JOAQUIN LIGHT AND POWER CORPORATION (a Corporation), Appellant.

Thos. J. Straub, W. R. Dunn and F. H. Pearson for Appellant.

Conley, Conley & Conley, W. M. Conley, Philip Conley and Matthew Conley for Respondent.

THE COURT.—Plaintiff is a corporation organized under the laws of this state. It is the owner of the Clearing House Mine situated in Mariposa County some considerable distance from the city of Merced, where the principal place of business of the company is located. Since its organization in 1911 until his death in 1926 J. B. Hart was its secretary and treasurer. Hart was also cashier of the Farmers and Merchants National Bank of Merced. Hart resided in Merced, where the principal place of business of the bank was located and where he carried on his duties as an officer of the two corporations. At the times herein mentioned up to the time of his death, Hart's reputation for honesty and integrity was of the very highest. He undoubtedly had the implicit confidence of his business associates, including the members of the board of directors of the plaintiff mining company. He was given much broader powers than those

usually appertaining to the two offices held by him in the mining company. In fact, the president of the company testified that Hart had entire charge of the business affairs of the mining company. The defendant was engaged in the business of manufacturing, distributing and selling electricity to be used for light and power purposes. Its principal place of business had been Los Angeles, but some time in the year 1925 it was removed to Fresno, California, about fifty miles south of the city of Merced. The representative of the defendant power company in the city of Merced was R. Casad, who held the title of district manager. His district covered practically all the county of Merced and a portion of Mariposa County. He and Hart were lifelong friends. His duties were those usually performed by a district manager of a light and power company, and included the solicitation of business for his employer, the collection of the bills of the consumers, and he also solicited on behalf of his company the sale of prior preferred stock issued by his company under authority of the railroad commission of the state. Casad approached the officers of the mining company, Mr. Kocher, its president, and Mr. Hart, its secretary and treasurer, regarding the supplying of electricity to operate the mining operations of the plaintiff company, and as a result of his efforts a written agreement was entered into by the plaintiff mining company and the defendant power company, on August 27, 1921, whereby the latter company agreed to extend its power line to the Clearing House Mine and to furnish the mining company with electric energy to operate said mine. It was estimated that the cost of making this extension would be in the neighborhood of $40,000. The mining company in this agreement was to pay to the power company $13,200 in cash, and was also to purchase from the power company on or before September 1, 1921, 274 shares of its prior preferred stock at $98.50 per share, amounting in the aggregate to the sum of $26,989. One of the terms of this agreement was that the mining company should not sell or dispose of this stock for five years from that date. This agreement was executed by Mr. Kocher, as president, and Mr. Hart, as the secretary of the mining company, and by Mr. Wishon, the general manager, and Mr. Durfey, the assistant secretary of the power company. Another written agreement was entered into at

the same time between the same parties, whereby the power company agreed to furnish and the mining company agreed to pay for electrical energy to operate the mining machinery at the mine of the plaintiff. This agreement was executed by Kocher and Hart, as officers of the mining company, and by M. E. Newlin, manager of the commercial department of the power company. A third written agreement was also entered into between the same parties, dated August 31, 1921, whereby the mining company agreed to dig all holes for the poles to be used in the construction of the power line which the power company had agreed to extend to the mine of plaintiff, and the power company agreed to pay the mining company a certain sum of money for said service. This agreement was executed by R. Casad on behalf of the power company and by J. B. Hart on behalf of the mining company. A day or two after this agreement of August 27, 1921, was executed, Hart came to Casad and said that the mining company did not have the money to buy the 274 shares of stock from the power company, and asked Casad to have the stock issued in his [Casad's] name and then to borrow from Geo. H. Bloss $17,000, giving the stock as security, and he as treasurer of the mining company would put up the balance needed to pay for the stock in full. At first Casad objected to this proposal, and stated that he did not wish to use his credit on behalf of the mining company. Hart assured him that it would be all right as he, Hart, had full authority from the mining company to handle the purchase of said stock. Casad then agreed to the plan. He signed a stock purchaser's agreement for the 274 shares, and forwarded the same to the power company. In the meantime, he had talked with Mr. Alexander, stock sales manager of the power company, regarding the stock being issued in his [Casad's] name, and Alexander assented to the plan. Casad then contacted Bloss, and the latter agreed to loan him $17,000 on 200 shares of the stock for one year at seven per cent interest. The note for $17,000 was drawn up by Hart at his office in the bank, and Casad and Bloss went to the bank, where Casad executed the note and Bloss gave him his check for $17,000. The stock a few days later was sent to Hart, and two of the certificates for 100 shares each were delivered to Bloss as security for the $17,000 note. The other certificate for 74 shares was left with Hart.

The $17,000 received on Bloss's check was deposited by Casad to his credit in the bank. Hart from the funds of the mining company deposited $9,989 to Casad's credit, who then drew his check for $26,989 in favor of the power company and sent the same to the company in payment of said stock. At the time Hart suggested to Casad that he borrow this money from Bloss, he stated to Casad that he did not want anybody to know that the mining company was borrowing money and requested Casad not to mention the matter to anybody. This request was assented to by Casad, and he did not mention the matter of the loan to any other persons, not even to the directors of the mining company. We must except from this statement the conversation between Casad and Alexander mentioned above. The mining company paid to the power company the cash payment of $13,200 provided for in the contract of August 27, 1921. In the latter part of the following June, Hart requested Casad to ascertain from the power company whether it would buy back the stock. Casad did so, and the company agreed to buy back the stock at $95 per share. Thereupon and under the direction of Hart the stock was transferred to the company at that price. Casad paid off the loan to Bloss, and the balance of the money received from the sale, amounting to $8,837.75, together with a small amount advanced by Hart, was paid by Casad to Hart, the treasurer of the mining company. The exact amount of this payment was $9,030. Nothing further was heard of this matter until after the death of Hart, which occurred in September, 1926. Just prior to his death a federal bank examiner had ordered the Farmers and Merchants National Bank, of which Hart was cashier, to suspend business for the reason that it was found that Hart had embezzled the funds of the bank. Upon hearing of said order Hart committed suicide. It was found upon an investigation of his affairs that he had embezzled funds belonging to the plaintiff mining company and to other persons, as well as the funds of the bank. The papers and records of the Original Mining and Milling Company, which up to that time had been in the possession of Hart, were turned over to the directors of said company. The entire transaction regarding the purchase and resale of said 274 shares of stock was then brought to light, with the result that the mining company brought this action against the

power company to compel the power company to issue to the plaintiff 274 shares of the prior preferred shares of stock of the defendant corporation as of the date of September 1, 1921, together with all dividends accruing thereon from said date; or pay and return to the plaintiff the sum of $26,989, with interest; or for damages in the sum of $42,011. The action was tried by the court with a jury and a verdict was rendered in plaintiff's favor in the amount of $42,011, from which the defendant has perfected an appeal upon a bill of exceptions.

In plaintiff's complaint are set forth the facts attending the purchase of said 274 shares of stock of the defendant company, followed by an allegation: "That after the payment to said defendant of said sum of $26,989, in payment for said shares of stock, the said J. B. Hart, as such secretary and treasurer of plaintiff, without the knowledge or consent of plaintiff, and in order to cheat and defraud plaintiff, fraudulently conspired with defendant, and the said defendant and said J. B. Hart fraudulently devised and contrived a plan whereby plaintiff should be cheated and defrauded of the said sum of $26,989 so paid for said shares of stock, and should be cheated and defrauded of said shares of stock. In pursuance of said conspiracy so entered into by said defendant and said J. B. Hart, and in order to carry out the fraudulent plan and scheme devised by said Hart and said defendant, it was arranged that when said shares of stock were issued, the same should be issued not in the name of the plaintiff but in the name of said R. Casad, and that said shares of stock should not be delivered to the plaintiff, but should be delivered to the said R. Casad. That thereafter, pursuant to said conspiracy and pursuant to said plan and scheme so devised by said defendant and said J. B. Hart for the purpose of so cheating and defrauding plaintiff, the said shares of stock, to-wit, 274 shares of the prior preferred stock of said San Joaquin Light and Power Corporation, were issued by said defendant in the name of said R. Casad, and were thereafter delivered to said R. Casad. That said San Joaquin Light and Power Corporation has at no time since making and entering into said agreement in writing with plaintiff, a copy of which is hereunto annexed and marked 'Exhibit A', issued or delivered to the plaintiff herein said 274 shares

of its prior preferred stock, or any shares thereof, or any other shares of stock whatsoever; nor has said San Joaquin Light and Power Corporation at any time returned or repaid to plaintiff the said sum of $26,989, or any part thereof, so paid by it, as the purchase price of said stock, to said San Joaquin Light and Power Corporation.'' Similar charges of fraud are made regarding each and every act involved in the entire transaction which culminated in the resale of said stock by Casad to the defendant and the application of the proceeds of such sale in the manner and to the persons hereinbefore related. Following these allegations, the plaintiff sets forth the reasons why the alleged fraud was not discovered by the board of directors of the plaintiff until after the death of Hart. These latter allegations were designed to meet the plea of the statute of limitations should such a plea be made upon the ground that the action had not been brought within three years after the alleged fraud was committed.

■ If the foregoing were all the facts involved in this case this action would in all probability never have been begun. For it appears from these facts that plaintiff, even if the charge of fraud could be proven, sustained but slight damage. In the first place, all that plaintiff invested in said 274 shares of stock was the sum of $9,989, and on a resale thereof plaintiff was paid $9,030, which would bring plaintiff's actual damage down to $959. This amount is further reduced by applying certain dividends accruing on this stock while it was in Casad's name and which were paid by Casad to Hart. But it appeared after the death of Hart that he had not only embezzled the sum of $9,030 paid to him by Casad on the resale of the stock, but also and some time in January, 1922, he had apparently embezzled the further sum of $17,000 and charged this sum against the purchase price of said stock. Plaintiff's loss, therefore, from Hart's embezzlement amounted practically to the entire purchase price of the stock. The defendant cannot, of course, be held liable for the money embezzled by the plaintiff's treasurer, Hart, unless it aided or abetted, or at least connived at, Hart's illegal acts in appropriating plaintiff's money, or unless the defendant had put it in the power of Hart to wrong plaintiff which he could not have done except for the acts of the defendant. ■ There is not a word of

evidence in the whole record in this case that Casad, assuming that in his dealings with Hart he acted within the scope of his authority as the agent of defendant, had any knowledge, or even suspicion, that Hart was misappropriating the money of his employer, or that he was intending or planning to embezzle any of the funds involved in the sale and resale of said 274 shares of stock. Nor is there any evidence that this transaction aided or abetted Hart, or furnished him any opportunity that he did not otherwise have, to commit said embezzlement. The $9,030 which he embezzled after the resale of the stock simply replaced in part the $9,989 which he, as treasurer of the company, furnished for the purchase of the stock in the first instance. Therefore, this transaction furnished no additional money for Hart to operate upon than that which had already been in his possession. As to the sum of $17,000, appropriated by Hart in January, 1922, the evidence conclusively shows that it had no connection whatever with any transaction between Hart and Casad, except that Hart attempted to show by fraudulent entries in the records of the mining company that it was paid out for the purchase of the stock. Where this money came from the evidence does not purport to show, but it was conclusively shown that no part of it came from the sale of the 274 shares of stock, nor was it, or any part of it, paid to the defendant company in payment of the stock, or for any purpose whatever. The stock had been paid for in September, 1921, by the $9,989 advanced by the mining company and the $17,000 borrowed from Bloss. It was, therefore, impossible for any part of this $17,000, which Hart fraudulently represented as paid on this stock, to have been used for that purpose.

Coming now to plaintiff's theory of the case, it is, as we understand it, that plaintiff paid in full for the 274 shares of stock at the time of its purchase in September, 1921, and that, as it never parted with said stock, it is now entitled to its return as of the date of its purchase, together with all dividends declared thereon since its purchase up to the time of the judgment, or in case said stock cannot be delivered, to the value of said stock at the time of its purchase, together with the amount of all dividends thereon. Plaintiff alleged that it had paid for said stock the sum of $26,989 on the first day of September, 1921, and defendant

in its answer admits this allegation, but further alleges that, upon the resale of the stock it was repaid the sum of $26,030, as well as certain dividends that had accrued upon said shares of stock. As we have seen, plaintiff and defendant are agreed that plaintiff paid the sum of $26,989 for said stock, but when they come to show how the payment was made they disagree. Plaintiff claims that it paid $9,989 at the time of the purchase of the stock and $17,000 in January, 1922, no part of which has ever been repaid to it. As we have shown, there is absolutely no foundation supporting plaintiff's claim that this $17,000, noted by Hart as paid on this stock in January, 1922, was ever paid on said stock, or that any part thereof was ever paid to defendant for any purpose whatever. Eliminating this item, there would only be left the said sum of $9,989 which was actually paid by the plaintiff on the purchase price of said stock, and which, as we have shown, was practically all repaid to plaintiff. On the other hand, defendant contends that plaintiff paid for said stock by advancing said sum of $9,989 and by Casad, either as the agent of the plaintiff, or as the holder of said stock in trust for plaintiff, borrowing the sum of $17,000, which, together with the amount advanced by plaintiff, paid for said stock in full. Without committing ourselves as to the legal relation of Casad at the time in question, as we have already stated, the evidence conclusively shows that the stock was paid for in the manner outlined in defendant's contention. Therefore, if the plaintiff is entitled to recover in this action, it can only recover the purchase price of said stock, less the amount borrowed from Bloss to pay on said purchase price, and also less the amount paid plaintiff after a resale of said stock. This leaves, as we have seen, the sum of $959, which was further reduced by certain dividends paid to plaintiff during the time said stock stood in Casad's name. This amount, however, can be recovered against the defendant only in case Casad in the transactions involved in the purchase and resale of said stock was acting within the scope of his authority, as district manager of the defendant in the Merced district, or if defendant ratified the acts of Casad in said transaction.

We are mindful of the fact that the verdict of the jury in favor of the plaintiff is tantamount to an implied finding upon all issues made by the pleadings which would

include the issue as to whether Casad in the transactions involving the sale and resale of said stock was acting within the scope of his authority, as the district manager of the defendant. Therefore, if there is any substantial evidence supporting plaintiff's claim that Casad in the transaction was so acting, the implied findings of the jury cannot be disturbed on appeal.

The evidence showed that Casad was district manager of the defendant. As such he had only limited powers. While he was authorized to solicit business for his principal, that is to sell electrical energy to residents of his district to be used for light and power purposes, to collect the bills due the company for that service, and also to solicit the sale of an issue of stock known as prior preferred stock of the kind involved in this action, when his action involved matters outside of these just mentioned his authority was subject to approval by the regular officers of the company. This was apparent and particularly so to the plaintiff from the limited part taken by Casad in the transactions between the plaintiff and defendant herein which culminated in the agreements whereby the defendant agreed to extend its power line to plaintiff's mine and the latter agreed to purchase and pay for electrical energy to operate the mine. While Casad solicited this business the final contracts between the parties were executed on behalf of the defendant by regular officers of the company, and not by Casad, either in the capacity of district manager, or otherwise. It is true that the agreement to perform the labor of digging the holes for the poles to be used in the extension of the pole line was signed by Casad as district manager of the company. But this contract was of minor importance in comparison with the other two contracts, and the fact that Casad had no authority to act in these major matters was direct and positive notice to plaintiff that Casad's position as district manager clothed him with only limited or special powers. ■ In such a case the legal principle is applicable that where an agent acts under a special or limited authority, the party dealing with him is bound to know at his peril what the power of the agent is, and to understand its legal effect. (1 Cal. Jur., p. 715.) This principle is more fully but aptly stated as follows: "It is therefore declared to be a fundamental rule, never to be lost sight of

and not easily to be overestimated, that persons dealing with an assumed agent, whether the assumed agency be a general or special one, are bound at their peril, if they would hold the principal, to ascertain not only the fact of the agency but the nature and extent of the authority, and in case either is controverted, the burden of proof is upon them to establish it.'' (Mechem on Agency (2d ed.), vol. 1, p. 527.)

The part taken by Casad in having the 274 shares of stock issued in his name and in borrowing money thereon to be applied on their purchase price was not done at the instance of or in the interest of the power company, but as an accommodation to Hart, as a representative of the mining company, in order to enable the mining company to fulfill its contract to purchase said shares of stock. And when Mr. Alexander, the stock sales manager of defendant, assented to this plan he did so, not for the purpose of gaining any advantage for his own company, but to enable the mining company to secure the necessary funds to pay for said stock. It must be borne in mind that this whole transaction, of which the mining company complains, took place entirely after the mining company had bound itself by written agreement to buy said stock at the agreed price of $98.50 per share, and whatever Casad did independently, or with the consent of Mr. Alexander, in connection with this transaction, was done for the purpose of assisting the mining company to carry out the terms of said written agreement. The evidence fails to show that in these matters Casad was acting within the scope of his employment. On the other hand, the evidence shows that in so acting he stepped outside the course of his duties and powers as the district manager of the defendant, and performed acts wholly foreign to and inconsistent with his employment, and for the purpose of accommodating and assisting his friend, Hart, who, Casad had every reason to believe, was not only acting for the plaintiff mining company, but was also looking after his interest. It follows, therefore, that the defendant cannot be held liable for the acts of Casad, which were not within the scope of his authority as the district manager of the defendant, and that the judgment herein against the defendant predicated upon the acts of Casad cannot be maintained.

As we view this unfortunate affair, whatever loss has been sustained by the plaintiff in this action was entirely due to the dishonest actions of its trusted employee and officer, Hart. While the directors of the plaintiff testified that Hart was not given any specific authority to take the certificates of stock in the name of Casad, or to borrow money thereon, either in the name of the company or in Casad's name, they also testified that Hart had entire charge of the business affairs of the mining company, and the president of the company, Mr. Kocher, stated in regard to this stock transaction, "I had entire confidence in Mr. Hart. The board of directors with myself included gave Mr. Hart full authority to buy this stock for the mining company. I did not tell him how to do it, nor as to the manner in which he should handle it. I had enough confidence in him to believe that he would handle it in the proper way, he had full charge of the matter." With the evidence showing that Hart possessed these broad powers, it is difficult to perceive how the company can shift the loss due to his dishonest management of its affairs on to the defendant or on to anybody else without showing some fraudulent conspiracy between Hart and the person to be charged. Even if Casad fraudulently conspired with Hart to defraud the mining company out of said stock or of any money connected with the purchase or resale of said stock, as such acts of Casad were wholly outside the scope of his authority as the agent of the defendant, any loss sustained by the plaintiff by reason of this fraudulent conspiracy cannot be recovered from the defendant. We are not satisfied, however, that the evidence shows any fraudulent conspiracy existed between Hart and Casad. Whatever Hart's intention and purpose were in this transaction, there is no evidence that Casad was party to any fraudulent or dishonest act, committed by Hart, or that he had knowledge of any fact that would put him upon notice of Hart's fraudulent purposes. Casad in this whole transaction acted upon the suggestion and under the direction of Hart. When it was first suggested to him by Hart that the stock be placed in his name and that he borrow money thereon to be applied on its purchase price, he objected to the suggestion for the reason, as stated by him at the time, that he did not want to use his credit in that manner. But at

the earnest and persistent solicitation of Hart, and upon the assurance of Hart that he had full authority from the mining company to handle the transaction as he wanted to, Casad finally agreed to the plan suggested by Hart. Casad trusted Hart implicitly, as did the directors of the mining company, the officials of the bank, and the people generally in that community. There is not one word of evidence that would justify the inference that Casad had any knowledge or even suspicion that Hart was dealing falsely with his company. There is also the further fact that Casad did not in any manner profit by any of Hart's dishonest conduct. The evidence does not show that one dollar of Hart's ill-gotten gains found its way into Casad's pockets. Casad was simply deceived by Hart as were the many others who had so implicitly trusted him. The inference of fair dealing on the part of Casad to be drawn from the evidence in this case is exceedingly strong, and we think greatly outweighs any inference of fraud. ■ "If there be two inferences equally reasonable and equally susceptible of being drawn from the proven facts, the one favoring fair dealing and the other corrupt practice, it is the express duty of court or jury to draw the inference favorable to fair dealing. (Citing authorities.) For fraud must always be proved, so that when the plaintiff's case goes no further than to establish a state of facts from which the inference of fraud may or may not be reasonably drawn, he has failed to establish his charge by a preponderance of the evidence, and it becomes the duty of court or jury, as has been said, to find in favor of innocence and uprightness." (*Ryder* v. *Bamberger*, 172 Cal. 791, 799 [158 Pac. 753, 756].) Other authorities might be cited to the same effect, but the rule announced above is so well established that further reference to the adjudicated cases of this state is unnecessary. This rule goes further than the necessities of this case, as it is most difficult for us to draw any inference of fraud from the conduct of Casad in his dealings with Hart in reference to the purchase and resale of said stock. As Hart was the agent of the plaintiff, invested with broad powers, and as it was solely through his dishonest dealings that plaintiff has been caused to lose its money and property, no recourse for this loss can be had in this action against defendant.

166

Defendant at the close of plaintiff's evidence made a motion for a nonsuit. It should have been granted, and the court erred in denying said motion.

In view of our determination of the questions stated above, it is unnecessary for us to pass upon the question of the statute of limitation or that the action is one in equity and the judgment should be reversed by reason of the failure of the trial court to make findings.

The judgment is reversed with directions to the trial court to set aside the verdict rendered herein, and render judgment in favor of the defendant.

Rehearing denied.