[Civ. No. 6692. Third Dist. Feb. 3, 1942.]

HATTIE HOLMAN, an Incompetent Person, etc., Appellant, v. STOCKTON SAVINGS AND LOAN BANK (a Banking Corporation) et al., Respondents.

Ira B. Langdon for Appellant.

Rutherford, Jacobs, Cavalero & Dietrich, Newton Rutherford, D. R. Jacobs, Philip Cavalero and Stephen Dietrich for Respondents.

STEEL, J. pro tem.— This is an appeal from a judgment in favor of the respondents (defendants in the court below) and presents squarely the question as to whether the findings and judgment are supported by the record. The suit, equitable in its nature, was instituted by plaintiff, a widow of the age of 85 years, wherein she sought a cancellation or reformation of certain instruments executed in connection with her indebtedness to the defendant bank, together with injunctive relief and damages alleged to have been sustained as a result of the sale of certain shares of stock. It is alleged that the defendants entered into a conspiracy to unlawfully secure possession, title and control of the property of plaintiff, and that between the years of 1924 and 1938 they did so

obtain all of plaintiff's property. That in so doing the defendant bank and its agents and officers used the plaintiff's three children, the defendants George Holman, Charles Holman and Hattie G. Holman as tools or agents in furtherance of such fraudulent scheme to obtain said property.

The record discloses that Mrs. Hattie Holman, plaintiff and appellant herein, had been a lifelong resident of San Joaquin County, and became a widow in 1910; that for a great number of years members of her family had been stockholders and otherwise connected with the defendant bank. At the time she became a widow in 1910 it appears that Mrs. Holman received from her husband's estate property of a value in excess of $100,000, and that this property increased in value to approximately $180,000 in 1924, when the transactions resulting in this litigation are alleged to have commenced. Her property then consisted of stock in the defendant bank, real estate in the city of Stockton, and other property.

Substantially the following is a general résumé of the various financial transactions complained of: The record shows that in May, 1924, the plaintiff and appellant, Mrs. Hattie Holman, executed her promissory note in the sum of $8,000 in favor of the defendant bank, and thereupon instructed the bank, through its assistant cashier, Mr. Holmes, who handled the transaction, to deposit the proceeds thereof to the account of George and Leland Holman, her sons. With reference to this transaction, it is urged on behalf of appellant that the bank was unauthorized to deposit the proceeds of this note to her sons' account. However, the testimony of Mr. Holmes shows that it was appellant's instruction that the money be so deposited. It further appears that the defendant Charles Holman, one of the sons of appellant, was the owner of a dairy ranch situated in San Joaquin County, which was encumbered by a trust deed securing a note of $50,000, and that early in 1925, a notice of default and intention to sell was filed; that at the request and suggestion of the defendant George Holman, a brother of Charles, the defendant bank promised to loan George the necessary money with which to purchase the ranch at the price of $52,400 upon the understanding that George and his wife Elsie would execute a trust deed thereon securing a note in the principal sum of $45,000 (this amount being the maximum loan permitted under the bank's appraisement) and execute an additional note with the appellant here as co-maker, for the balance of the purchase price amounting

to $7,400. This transaction was concluded accordingly in July, 1925, and George Holman thereafter operated the ranch for several years without making any profit, and in fact at a considerable loss, he having had to borrow money on many occasions from the defendant bank with which to meet the current taxes, interest, and other operating expenses. These advances were evidenced by notes which were also signed by the appellant as co-maker. In 1935 foreclosure proceedings were instituted by the bank, and the ranch was finally deeded to the bank by George and his wife Elsie in September of that year in satisfaction of their outstanding indebtedness. According to the bank's records it wrote off $9,000 as a net result of this deed of trust loan on the ranch property of George. It appears that during the period that George Holman operated the ranch the appellant not only executed numerous notes in favor of the bank as co-maker with her son George, but she did in many instances execute notes individually, the proceeds of which were deposited directly to her own account.

In December, 1931, she owed the bank $27,500 on direct loans and $32,400 as guarantor, or a total indebtedness of $59,900. During 1932 her guaranteed obligations increased by renewal of the notes comprising the same, including an additional advance of $3,600, and an additional note of $3,000, the proceeds of which were deposited to the account of George Holman, making a total guaranteed indebtedness of $39,000. During the same year and up to December, 1932, appellant's direct indebtedness increased from said $27,500 to the sum of $30,200. It will thus be noted that in December, 1932, the total liability of appellant to the defendant bank was in the principal sum of $69,200. It will be recalled that the original loan made by defendant bank to George Holman with which to purchase the ranch and which was secured by the trust deed thereon was made upon a percentage basis of the appraised value of the ranch. The subsequent loans were advances made by the bank to George and his wife as evidenced by the several notes which his mother, the appellant herein, guaranteed in the aggregate sum of $39,000, and it is shown that they were so made by the bank solely upon the security of the appellant's guarantee and not that of the property itself or George and his wife. This appears definite even though the notes recite, as is customary, that they are secured by the deed of trust. With this picture before it of $69,200 of unsecured

indebtedness of appellant, the bank, through its vice-president, Mr. Eberhardt, one of the respondents here, sent a credit memorandum to appellant showing the then present condition of her account, and stating it was necessary that the indebtedness be secured. The bank suggested that appellant obtain a loan of $18,000 on 267 shares of the bank's stock owned by appellant and apply the proceeds thereof to her indebtedness, thereby reducing it to the sum of $51,200, and further that this latter amount be secured by executing a deed of trust upon certain city property of appellant known as the United States Hotel, and also the assignment of a certain note and deed of trust owned by appellant and referred to as the Williamson note and deed of trust in the sum of $30,000.

In this connection it appears that following several conversations between Eberhardt, appellant, and her daughter Hattie G. Holman, the suggested plan of refinancing was accepted and accordingly appellant pledged her stock consisting of 267 shares to one A. W. Simpson for a loan of $18,000, the proceeds of which were applied upon certain of the outstanding notes of appellant, thereby reducing her total indebtedness from $69,200 to $51,200, which latter amount consisted of $12,200 of her direct indebtedness and $39,000 in notes which she had heretofore guaranteed for her son George. Shortly thereafter in January, 1933, pursuant to the plan suggested and agreed upon, appellant executed her note to the defendant bank in the principal sum of $51,200, and as security therefor executed the deed of trust upon the hotel property and assigned to the bank the Williamson note and deed of trust. In due course the notes in the principal sum of $39,000, which appellant had guaranteed for her son George were endorsed to her by the bank and delivered to her daughter for her.

It may be observed that appellant, by reason of advanced age as well as her physical condition, seldom left her home, and that most of her business transactions were carried on by telephone, correspondence and by and through her daughter Hattie. She was called as a witness at the trial herein, and it is apparent from her testimony that her memory had at that time failed to the extent that she had no comprehension of what was taking place.

In January, 1934, a Mr. Francis Cutting, engaged in real estate brokerage business in Stockton, became the agent of appellant, and thereafter until 1937 actively cared for her

properties, collected rents, obtained tenants, and in general transacted such business matters as related to the property and affairs of appellant. It appears that during the latter part of 1934 Mr. Cutting conferred with appellant at her home with reference to selling the 267 shares of stock which she had theretofore pledged. Appellant said she would like to sell the stock, and asked Mr. Cutting if he thought he could sell it. He told her he would try, and after interviewing several persons who he thought might be interested, but who were not, he advised appellant accordingly, and suggested if she would put a definite selling price upon the stock it might help. Appellant then placed the selling price of $25,000 for the stock; shortly thereafter Cutting contacted the defendant Eberhardt, who, after some negotiations, made an offer of $24,000 for the stock, which offer Cutting submitted to appellant, who in turn told him to go ahead and take it and close the transaction.

Additional loans were made by the bank to appellant during the years 1933 and 1934, and in June, 1934, the defendant bank, pursuant to the assignment which they had, foreclosed the Williamson trust deed, buying the property in for and on behalf of appellant. Thereupon appellant executed several renewal notes representing the said additional loans made in 1933 and 1934, as well as a new note in the principal sum of $2,200, and as security therefor appellant executed a deed of trust upon the property which had just been foreclosed upon, and which trust deed was given as additional security for the balance of all outstanding indebtedness to the bank. This transaction in effect merely substituted the new deed of trust in the place of the assignment of the former Williamson trust deed, together with the further advances which made the total indebtedness now approximately $60,000.

The record discloses that on or about December 11, 1936, appellant again renewed her notes, and at this time the total of her indebtedness had reached the sum of $79,396.68; she executed two notes, one in the principal sum of $70,000 and another in the principal sum of $9,396.68 (accumulated interest) together with a new deed of trust upon the United States Hotel property. Shortly prior to this transaction the appellant had assigned to the bank the rentals from this property with a temporary arrangement for the bank to pay her $75 per month for living expenses and to meet monthly payments to a building and loan association.

In the forepart of 1938 an offer was received for the purchase of the United States Hotel property together with the furnishings at a figure of $55,000. The furnishings were owned by Mr. and Mrs. George Holman, who insisted upon receiving $7,500 for them. The bank, through Mr. Eberhardt, maintained that no such allowance for the furnishings could be considered as they were not worth more than $2,500. Subsequently the prospective purchaser offered $52,250 for the property without the furnishings, and the bank, under pressure somewhat by the federal and state bank examiners, who were insistent that the loan be placed in a bankable condition, strongly urged and recommended the sale, the consummation of which would have materially reduced appellant's indebtedness and assured her of a net monthly income from the remaining property. Being unable to convince appellant of the advisability of such sale, and after correspondence had passed between them wherein the bank had stated its willingness to assist her but that since the loan was unbankable in its present condition (the bank having been required to write off approximately $22,000) there would be no other alternative, in the event the sale was not made, but to foreclose under the deed of trust. The offer of purchase was not accepted by appellant, and accordingly the bank instituted the present foreclosure proceedings by filing a notice of default in July, 1938.

The record here is voluminous—the opening brief itself comprises over 500 pages, and the trial of the case occupied some five weeks. After submission thereof the trial court made full and complete findings in favor of the respondents and against the contentions of appellant, which findings covered all of the material issues presented by the pleadings. Appellant attacks the findings as lacking evidentiary support, and urges as grounds for a reversal of the judgment that the evidence establishes incompetency of appellant at all times over the period of years during which the various transactions herein related occurred; that the defendants occupied a fiduciary relation toward the appellant; that appellant was induced to execute the various notes, deeds of trust, and the sale of stock, by the exercise of fraud, misrepresentation, concealment, undue influence, and other wrongful acts of the defendants; that appellant had no independent advice, and that the evidence is without serious conflict and preponderates in appellant's favor upon the main issues.

The principal witnesses testifying in support of appellant's incompetency were her children named herein as defendants, and a nurse who attended her in 1935. An examination of this testimony discloses that in the opinion of the several witnesses appellant was incompetent during most of the time here under consideration. The reasons given as the basis for such opinion do not appear to be of much weight. It was admitted by some of the witnesses, and in particular appellant's daughter Hattie, that her mother always signed her checks and understood business transactions when thoroughly explained to her. In one instance concerning a check, the witness was asked, ''Q. And your mother wanted to know whether it was to be charged to the house, or whoever the payee would be? A. Yes, sir. I wrote that out for her and she signed it; that is my handwriting (indicating). Q. And your mother wanted to know where the money was going? A. Why certainly. Anyone wants to know where their money is going.'' And again the witness testifying in relation to the pledge of the stock, was asked by the court:

''Q. You mentioned bank stock at the time you handed her that attached assignment? A. Yes. Q. And explained to her that she was assigning her stock? A. That is correct, yes. But I had to tell her a good many times to explain it. Q. Yes. Did she appear to understand it after you explained it several times? A. Oh, about four or five times I had to tell her, then she finally understood it. Q. She finally understood it was for a loan? A. That is correct.''

George Holman testified that in his opinion his mother was incompetent, giving as some of the reasons therefor that she had hidden a note and some papers under a mattress and had hidden a jelly sandwich under her pillow, and also because she did not tell him about a loan she had made from the building and loan association. The rest of the testimony on this subject runs along the same line, and opposed to this we have the testimony of many disinterested witnesses testifying that she was sane and rational at all times during the period in controversy. Some of these witnesses were Mr. Cutting, who acted as her business agent; appellant's sister, Mrs. Mattie Smith, who had visited back and forth with appellant at frequent intervals and conversed with her many times over the telephone; Mrs. Edna Grupe, a sister-in-law, who had known appellant thirty-eight years, and had visited with her continu-

ously, many times at the home of appellant as well as meeting her at the home of relatives. Also the testimony of Emil Gumpert, who acted as attorney for appellant on an occasion in 1937, and conversed with her, who testified that he did not observe anything irrational in her appearance during the conversation. Dr. Fred J. Couzelman, called by appellant as an expert on mental cases, testified he had examined appellant in January, 1939, which it appears was during the course of the trial, and found her suffering from senile dementia, defined by the witness as old senile decay,—second childhood, and that this condition had probably been coming on gradually for several years.

 The law in this state is clear that senile dementia does not render one incapable of executing contracts or transacting business. (*Gosnell* v. *Lloyd,* 215 Cal. 244 [10 Pac. (2d) 45]; *Estate of Purcell,* 164 Cal. 300 [128 Pac. 932]; *Rollins* v. *Smith,* 72 Cal. App. 773 [238 Pac. 171].)

 An examination of the record compels the conclusion that there is ample evidence to support the court's finding of mental competency and capability of understanding the nature of all transactions which appellant had with the defendants.

The court found "that the defendant children of appellant occupied a confidential relationship toward plaintiff, their mother," which finding is not questioned. The court also made a finding "that plaintiff had and reposed in defendants and each of them confidence and belief." It is appellant's contention that this is a finding that defendant Eberhardt and defendant bank occupied a fiduciary relationship of trust and confidence toward appellant. The court further found in this connection that at no time did the defendants bank, Eberhardt or Simpson assume management of plaintiff's business, and "that the relationship between the defendant bank and plaintiff was and is that of debtor and creditor, except that prior to the sale of said 267 shares of stock in 1934 plaintiff was a stockholder in defendant bank."

Irrespective of the conflict in the findings, if any there be, on the question of confidential relationship between the bank and appellant, we are satisfied from the record that the evidence would warrant a finding, technically at least, that a confidential relationship existed, that is to say, appellant had confidence in the bank and its officers, due no doubt in a large measure to the fact that she, as well as several

members of her family, had long been closely identified with the defendant bank.

However, the evidence shows, and the court has found, that the defendant bank and its officers have never assumed the management of appellant's property, her affairs being handled by herself with the independent advice of members of her immediate family and for a period by Mr. Cutting, her agent, and also at times from her counsel. A large portion of the indebtedness was incurred as early as 1932 and prior to the time the bank had obtained any security from the appellant whatsoever.

The rule that fraud must always be proved by convincing evidence and is never presumed, is so well established in this state that it seems unnecessary to cite authorities. However, in *Estate of Mallory,* 99 Cal. App. 96 [278 Pac. 488], it is said:

"An essential element of the rule is that one person has suffered some injury through the abuse of confidence by another, and that fact must be alleged and proved. It must be made to appear that the relationship was used to obtain an unfair advantage or that confidence was violated. (*Dimond* v. *Sanderson,* 103 Cal. 97 [37 Pac. 189]; *Cole* v. *Wolfskill,* 49 Cal. App. 52 [192 Pac. 549].)"

And in the later case of *Original Mining & Milling Co.* v. *San Joaquin Light & Power Corporation,* 220 Cal. 152 [30 Pac. (2d) 47], the court in discussing the duty with reference to drawing inferences, says, at page 165:

"If there be two inferences equally reasonable and equally susceptible of being drawn from the proven facts, the one favoring fair dealing and the other corrupt practice, it is the express duty of the court or jury to draw the inference favorable to fair dealing. (Citing authorities.) For fraud must always be proved, so that when the plaintiff's case goes no further than to establish a state of facts from which the inference of fraud may or may not be reasonably drawn, he has failed to establish his charge by a preponderance of the evidence, and it becomes the duty of court or jury, as has been said, to find in favor of innocence and uprightness. (*Ryder* v. *Bamberger,* 172 Cal. 791, 799 [158 Pac. 753, 756].)"

There is no evidence or suggestion of any secret profits having been made by the bank, and all business transactions had with the appellant appear to have been entirely fair and open.

■ It is argued that the purchase of appellant's stock by the defendant Eberhardt was induced by fraud, misrepresentation and undue influence and at a price far below its actual value. It is contended that evidence was improperly admitted with reference to other sales of stock of the defendant bank on the question of value. The stock was not listed and had no established market value and the rule appears to be that in such cases evidence as to its actual value should not be closely restricted. (*People* v. *Schwarz*, 78 Cal. App. 561 [248 Pac. 990]; *Peek* v. *Steinberg*, 163 Cal. 127 [124 Pac. 834].) At any rate the record contains expert as well as other evidence amply sufficient to sustain the finding that the fair and actual value was approximately the price paid therefor.

■ With reference to the facts concerning the sale of stock we have hereinbefore related the circumstances giving rise to and surrounding this sale, and we are unable to discover any suggestion of fraud or sharp practice inflicted upon appellant by any one concerned in the transaction.

We are not unmindful of the distress of the appellant as a result of this unfortunate financial reverse, but it seems apparent that it was her desire to render whatever financial assistance she could to her children, and in particular to her son George and his wife, in their ranch operations, even though in so doing it jeopardized her own property to the extent that she lost it. This is not unnatural and frequently happens. Other points are urged but further discussion appears unnecessary.

We conclude that the findings and judgment of the trial court are amply supported by the evidence, and the judgment is therefore affirmed.

■ Since the argument and submission of this cause, it has come to the attention of the court that appellant, Mrs. Hattie Holman, has died. It is ordered, therefore, that this judgment be filed *nunc pro tunc* as of the date of submission, to wit, January 6, 1942. (*Estate of Randall*, 194 Cal. 725 [230 Pac. 445]; *Estate of Dolbeer*, 149 Cal. 227 [86 Pac. 695, 9 Ann. Cas. 795]; 2 Cal. Jur. 974.)

Thompson, Acting P. J., and Tuttle, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 2, 1942. Carter, J., voted for a hearing.