Ruth HENDRICKSON, substituted for Ole J. Hendrickson, Deceased, individually and on behalf of the Heirs of John and Anna Hendrickson, Plaintiff and Appellant,

v.

Henry G. SYVERSON and Lena Syverson, Defendants and Respondents.

No. 7677.

Supreme Court of North Dakota.

May 1, 1957.

C. D. Aaker, Minot, and Claude Caldwell, Redding, Cal., for plaintiff and appellant.

Swendseid & Bekken, Stanley, for defendants and respondents.

MORRIS, Judge.

In November 1925 John Hendrickson and Anna Hendrickson, his wife, "in consideration of the sum of One Dollar and Other Valuable Consideration" executed a warranty deed conveying 400 acres of land in Mountrail County to Henry G. Syverson. The deed is dated November 7, 1925, acknowledged by the grantors November 20, 1925, in the State of Washington, and was recorded in the office of the register of deeds of Mountrail County, North Dakota,

November 27, 1925. It bears three dollars in revenue stamps.

This action was commenced by issuance of summons on August 30, 1950. Attached to the summons is a complaint alleging that the land was deeded to Henry G. Syverson in trust for the purpose of making a loan thereon. The prayer of the complaint asks that the title be declared to be held in trust by Henry G. Syverson for the benefit of all of the heirs of John Hendrickson and Anna Hendrickson and that the defendants be compelled to make an accounting of the rents, profits, and proceeds of the land.

The defendants answer that the deed above described is absolute and unconditional and that they have been in possession of the land as owners thereof since November 7, 1925. They further allege that the plaintiff's cause of action is barred by the statutes of limitation and by the laches of the plaintiff in prosecuting the action and that during the intervening time they have been in continuous open and notorious possession of the land. They also allege that the land was conveyed to the grantee by the grantors subject to then past due mortgages and unpaid taxes in excess of the value of the land and that the defendants have retired most of the indebtedness and the land has materially increased in value.

The plaintiff replied to the answer setting forth in detail his contention with respect to facts which he urges establish that the deed in controversy was one of trust rather than an absolute conveyance.

Since the commencement of the action the original plaintiff Henry Hendrickson has died and the presently named plaintiff is the widow of Ole J. Hendrickson, also deceased, who was for a time named as plaintiff. We will now set forth the facts which furnish the background for and give rise to this controversy. The grantors are both dead. John Hendrickson died February 23, 1928, and his wife Anna died October 31, 1934. Surviving them were four children. Sophie Hendrickson, a daughter, died in 1952. Henry Hendrickson, a son, and the original plaintiff in this action, died February 10, 1953. Ole J. Hendrickson, another son, testified at the trial but has since died. The fourth child is Lena Syverson, wife of Henry G. Syverson, the grantee in the deed now under attack.

John and Anna Hendrickson left their farm in Mountrail County in the spring of 1917 and moved to Glasgow, Montana, where they stayed for two years. They then moved to the State of Washington and never came back to North Dakota to live. In April 1919 they sold the farm on crop payments to one Odegard who remained in possession of the farm through two crop years. He raised very little crop, paid nothing on the purchase price, and no taxes. He also placed a seed lien against the farm for $242.25. In September 1920 the daughter Lena was sent by her father to North Dakota to see Odegard. He immediately abandoned the farm and disappeared. Lena stayed in the neighborhood and that fall married the defendant Henry G. Syverson. In 1921 he rented and farmed land in the vicinity of the Hendrickson farm. Lena was unable to secure a tenant for her father's farm in 1921 and no crop was planted on it that year. On the demand of John Hendrickson the Syversons moved onto his land in October 1921. They lived on and farmed it until 1934 when they leased it to a tenant. Mortgages amounting to $5,600 on the farm became due in 1924 and foreclosure was threatened. In 1925 the Syversons made an effort to secure a loan for John Hendrickson through the Bank of North Dakota. The bank could make real estate loans only to farmers who were residents of the state and could therefore make no loan to John Hendrickson. Section 5192a26 1925 Supp.C.L.1913. Lena testifies:

"Well, then we had to turn to some other financier and there were letters back and forth and we asked my par-

ents to come back and live on the farm and we would still work and help them and try to save the farm and my father refused and he said he had suffered too many hardships, that he would never come back, that we should try to look for financing. Then when we started the financing and then in August, 1925, they appraised our loan at thirty two hundred dollars ($3200.-00) was all we could get but we still had to pay the difference between the thirty two hundred and what was against it yet.

"Q. Now, what was the deal that you had at the time with your folks at the time that appraisal was made, if any? A. Well, father said if we could get a loan and pay the difference that we could take it over for what there was against it."

After Lena Syverson had given the foregoing testimony she was shown the following letter which she had written to her father and mother:

"White Earth, N. Dak.
Nov. 25

"Dear folks: We are enclosing deed for you to sign as that is the only way we can get a loan thru. We are taking out the state loan at 3200 and there will be $240. a year to pay and in 1953 there will be $160.55 left. Foss will take a second mortgage at 7% of a $1000 due next fall so the only way would be for you to take a note until next fall as the others won't make the loan if there is a third mortgage. With all that summer fallow we ought to be able to pay something any way. We are going to squeeze out $1400 on the principal $448 interest and the taxes now. Hope everything comes out alright. You have to go to a notary both of you to sign also have him typewrite your address where I made a light X. Henry wasn't sure so Larson left that out when he made it out.

"I don't know how much you want the note made out for so maybe you have one made out there and send down but don't mention anything about the deed as that will stop our loan.
 "Sincerely,
 "Lena, Henry
 and girls.
"It's so long since I heard from you hope you are alright.
 "Send the deed as soon as you can. Will have (to) have it here before Dec. 1."

It is a fair inference from all of the circumstances that this letter accompanied the deed under which Henry G. Syverson claims title. In explanation of the letter Lena testified that the second mortgage to Foss mentioned in the letter was never given. Apparently that part of the proposed arrangement was not consummated. Moreover the note referred to in the second paragraph was never drawn. When asked what was the final outcome, Lena said: "The final outcome, we took over all the refinancing and got the deed for what was against it."

When Henry G. and Lena Syverson went into possession of the Hendrickson farm in the fall of 1921 there had been little crop raised on it in 1919 and 1920 and no crop in the summer of 1921. No taxes had been paid during that period. These taxes were paid in 1923 by the Syversons who testify that they were paid from proceeds from the farm. Ole J. Hendrickson said he advanced the Syversons the money with which to pay them. The farm was encumbered for $5,-600 due December 1, 1924 with interest at six per cent per annum. John Hendrickson and his family had left the state. He was either unwilling or unable to use funds other than the proceeds of the land for the protection of his equity with the result that past due taxes, interest, and a seed lien took most of the farm income. There was no money for reducing the principal debt. Henry G. Syverson supported his family by

working at times at occupations other than farming. When the mortgage indebtedness became due in 1924 foreclosure was threatened which resulted in efforts being made by the Hendricksons and the Syversons to refinance the loan. Apparently the Bank of North Dakota was the only source of such credit at that time and it was closed to John Hendrickson because of the law prohibiting loans to nonresidents. This situation resulted in a transaction between the Hendricksons and the Syversons by which John Hendrickson and his wife deeded the farm to Henry G. Syverson who applied to the Bank of North Dakota for a loan. The application and the report of the appraiser who appraised the land for the bank were introduced in evidence by the plaintiff. In the application Syverson states that he purchased the farm from John Hendrickson for $10,000 and that the indebtedness against it is $5,600, which is the amount of the loan applied for. The appraiser recommended a maximum loan of $3,500 on August 18, 1925. He adds this comment:

"This land carries a heavy indebtedness and it is a question if applicant can obtain enough of a loan to satisfy the first Mtg. He states that he has on hand in bank now $800.00 to be used to finance this loan and his crop will assist him some, yet not a great deal as he considered the greater portion of the field too badly infested with wild oats to crop this year so summerfallowed same, having plowed it twice this season and has done very good work.

"Appl. appears to be a good farmer and a hustler. As to the purchase of this land I am informed that there was no definite understanding as to purchase price when Appl. took this land over from his father-in-law, the understanding was that he take over the land subject to indebtedness and the land would be his property."

In 1934 the Syversons refinanced the indebtedness against the farm by obtaining a land bank commissioner's loan through the Federal Land Bank in the sum of $4,000. This loan was later increased to $4,900 but has now been paid down to about $2100.00.

The Syversons lived on and farmed this land until 1934 when Mrs. Syverson's mother became ill. Other members of the family asked Lena to help take care of her mother. The Syversons rented the farm on a share crop basis and moved to Clear Lake, California, where the mother then lived. They have remained in California ever since. The first time the Syversons knew their title was being questioned was in 1950 when they received a telegram from Ole J. Hendrickson demanding that they come to Sacramento to discuss the acquisition of the farm by the Syversons.

The testimony of Henry G. Syverson is in substantial accord with that of his wife. In his cross-examination the following appears:

"Q. And how did you get the title, who did you get it through, put it that way? A. Well, I got the title through the loan company that handled that loan. The loan company was in contact with Mr. Hendrickson for the loan being due and Hendrickson, he, could not meet the payments, so, Hendrickson when he was stuck couldn't go no further, he said you can have the land for what's against it and I took it on that basis, no other thing. I took the land for what's against it and I think that is about all that the land was worth.

"Q. Where did you make this deal with him? A. They lived in Puget Island in Washington, I think it was. I lived in North Dakota. We couldn't talk to each other. In 1924 when the bank loan was due then the representative for the loan company took over and in 1925 he was in contact with Mr. Hendrickson, he could not make the loan, so he wrote to me and told me that he couldn't do no more, he was done. He asked me if I wouldn't take it over

for what's against it and I applied for a loan to the Bank of North Dakota and I paid the loan and paid the difference."

The only evidence indicating any interest on the part of the Hendricksons in the North Dakota land after it was deeded to Henry G. Syverson is that of Ole J. Hendrickson who testified that on September 11, 1926, he sent his father a check for $100 "to use toward farming in North Dakota" and that he had previously sent him that same year $25 for interest and taxes. There is no testimony that John Hendrickson used the money in connection with the North Dakota farm and any implication to that effect is flatly contradicted by the testimony of the Syversons that they paid all of the interest, taxes, and expenses of farming.

At the time the deed in question was given our statutes divided trusts into two classes, voluntary and involuntary. Section 6271, C.L.N.D.1913. An involuntary trust was defined as one which is created by operation of law. Section 6273, C.L.N.D.1913. Rosedale School District No. 5 v. Towner County, 56 N.D. 41, 216 N.W. 212. When the statutes were recodified in 1943 those pertaining to trusts were rewritten. Changes in nomenclature were made. What was formerly described as an involuntary trust became an implied trust. Section 59–0101, NDRC 1943. Section 59–0106, NDRC 1943 sets forth in four paragraphs the circumstances which give rise to implied trusts and includes both constructive and resulting trusts.

The Restatement of the Law distinguishes between constructive and resulting trusts as follows:

"Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises." Restatement of the Law, Restitution, Section 160.

"A resulting trust arises where a transfer of property is made under circumstances which raise an inference that the person making the transfer or causing it to be made did not intend the transferee to have the beneficial interest in the property transferred. A constructive trust is imposed not because of the intention of the parties but because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property. The trustee of a resulting trust, like the trustee of an express trust, is in a fiduciary relation to the beneficiary of the trust." Restatement of the Law, Restitution, Section 160b.

In Scott on Trusts, Second Edition, Section 404.2, we find that:

"Ordinarily a constructive trust arises without regard to the intention of the person who transferred the property. On the other hand, a resulting trust arises in favor of the person who transferred the property or caused it to be transferred under circumstances raising an inference that he intended to transfer to the other a bare legal title and not to give him the beneficial interest."

From plaintiff's evidence and the arguments of counsel it is difficult to determine whether the plaintiff is trying to assert a constructive trust or a resulting trust. It is argued that John Hendrickson and his wife were induced to deed the property to Henry G. Syverson by fraudulent representations on the part of the latter and his wife, but it is also contended that when the deed was given it was intended that the Hendricksons remain the beneficial owners and that Henry G. Syverson held only the legal title for their benefit.

In any event the plaintiff is attacking a warranty deed absolute on its face and asks the court to determine that it is not what it purports to be but in fact constitutes a conveyance in trust.

In Jasper v. Hazen, 4 N.D. 1, 58 N.W. 454, 456, 23 L.R.A. 58, which was an action to have a deed absolute on its face declared a mortgage, the court said:

"The presumption that an instrument executed with the formality of a deed or a contract deliberately entered into, expresses on its face its true intent and purpose, is so persuasive that he who would establish the contrary must go far beyond the ordinary rule of preponderance. To demand less would be to lose sight of this presumption, which is one of the strongest disputable presumptions known to the law. Hence, courts have, with great uniformity, in this class of cases, required the proof that should destroy the recitals in a solemn instrument to be clear, specific, satisfactory, and of such a character as to leave in the mind of the chancellor no hesitation or substantial doubt."

This rule was approved and followed in McGuin v. Lee, 10 N.D. 160, 86 N.W. 714. For other cases of similar import see Mechtle v. Topp, 78 N.D. 789, 52 N.W.2d 842.

Anderson v. Anderson, 17 N.D. 275, 115 N.W. 836, involved an action to set aside a deed to real property as having been executed through the influence of threats of violence or arrest. The court there applied the rule above quoted in upholding the validity of a deed.

We have adopted the same rule in determining the sufficiency of evidence to establish that a deed absolute on its face in fact created a trust whether constructive or resulting. Carter v. Carter, 14 N.D. 66, 103 N.W. 425; Fox v. Fox, 56 N.D. 899, 219 N.W. 784; McDonald v. Miller, 73 N.D. 474, 16 N.W.2d 270, 156 A.L.R. 1328; Bodding v. Herman, 76 N.D. 324, 35 N.W.2d 561; Johnson v. Larson, 79 N.D. 409, 56 N.W.2d 750; Lander v. Hartson, 77 N.D. 923, 47 N.W.2d 211.

In Shong v. Farmers' & Merchants' State Bank, N.D., 70 N.W.2d 907, 911, we held that the expressions and conduct of the parties indicated an intention to create a trust relationship and that a transaction by which property was purchased for the benefit of certain children with the title thereto running to one son gave rise to a resulting trust. We stated that:

"The courts are reluctant to ingraft a trust by parol on the legal title to real estate, and there is perhaps no better established doctrine than the one which requires a high degree of proof in order to establish the trust by parol evidence."

and called attention to a number of our cases holding that the proof of such a trust must be clear, specific, substantial, and satisfactory. We found that the evidence in that case met the test and upheld the contentions of the proponents of the trust.

The plaintiff apparently places great reliance upon Rovenko v. Bokovoy, 77 N.D. 740, 45 N.W.2d 492. In that case the defendant was left in charge of lands belonging to nonresidents. He failed in his duties as an agent with the result that the lands went to foreclosure and tax sale. The defendant with his own money secured title in himself adverse to the interest of his principals. We held that he acquired title as a result of his failure to perform the duties he owed the principals and that he held title under a constructive trust for their benefit under the rule that one who acquires title to property by fraud, duress, undue influence, or acquires or retains it in violation of a fiduciary duty will be held to hold the title so acquired in trust. The facts in that case are so dissimilar to those now before us that the case is of little assistance here.

The plaintiff points to the first and last sentences of the main part of the letter accompanying the deed, which we have heretofore quoted in full, as indicating fraud or misrepresentation on the part of the Syversons. The first sentence was

true in every respect. John Hendrickson could not get a loan from the Bank of North Dakota because he was a nonresident. Henry G. Syverson could and did get the loan because he was a resident and actual farmer. John Hendrickson knew this because he had tried to make the loan in the first instance and failed.

The last sentence of the letter states:

"I don't know how much you want the note made out for so maybe you have one made out there and send down but don't mention anything about the deed as that will stop our loan."

The trial court viewed the first clause of this sentence as supporting the Syversons' contention that they were buying the land. We agree with the trial court. At that time the Syversons may have had in mind giving a note to pay something to the grantors. Whether such an arrangement was contemplated or not it does not affect the deed as an absolute conveyance. At most it indicates that there may have been some details of the transaction that were not yet completed. But if there were such details they were entirely promissory and indefinite. They were not present misrepresentations and lend no support to the claim of fraud. The second clause of the sentence is wholly unexplained. The plaintiff argues that it indicates that a fraud was being perpetrated on the grantors. We draw no such conclusion. John Hendrickson was, as far as this record shows, an active, vigorous, and capable man still close to the prime of life. He lived in the State of Washington where he had gone after leaving his farm in North Dakota. The encumbrance on the farm was also his personal obligation for which he and his wife had signed promissory notes. The farm had not proved profitable for a number of years. None of his children except Lena lived in North Dakota. When all the circumstances are considered it was not an unreasonable act on his part to permit his son-in-law and daughter to take over the farm for the encumbrances

that were against it and thus free him from his personal obligation for the debt against it. Neither would it be unreasonable under the circumstances for the Syversons to fear interference on the part of the other children which would stop the loan. This is, of course, speculation but any interpretation of this clause which would impute fraud to Syverson in connection with this transaction would be even more speculative. From our review of this record we do not find a preponderance of evidence that would support a constructive trust. It falls far short of being clear, convincing, and satisfactory.

It is further suggested that the first sentence of the letter that accompanied the deed bears the implication that the deed was not intended as an absolute conveyance but that it was intended merely to transfer the legal title to the grantee while the grantors remained the beneficial owners. If this implication is to be given to that sentence it means that both the grantors and the grantee were resorting to a subterfuge to obtain a loan from the Bank of North Dakota contrary to the express provisions of the statute which restricted eligibility of borrowers to actual farmers who were residents of the State of North Dakota. Such an implication collides with the statutory presumptions "That private transactions have been fair and regular;" and "That the law has been obeyed; * * *." Section 31-1103, paragraphs 19 and 32, NDRC 1943. Jolley v. Begeman, 65 N.D. 205, 256 N.W. 912; Poppke v. Poppke, 57 S.D. 262, 231 N.W. 933; Fidelity & Deposit Company v. Grand National Bank of St. Louis, 8 Cir., 69 F.2d 177.

 Where evidence is equally capable of an honest or dishonest interpretation the court will adopt the interpretation that favors honesty. Hartford Accident & Indemnity Co. v. Oles, 152 Misc. 876, 274 N.Y.S. 349; Original Min. & Mill. Co. v. San Joaquin Light and Power Corp., 220 Cal. 152, 30 P.2d 47; Utah National Bank of Salt Lake City v. Nelson, 38 Utah 169,

111 P. 907; Annotation, Annotated Cases 1912A 705; 20 Am.Jur., Evidence, Section 229; 31 C.J.S. Evidence, § 126.

The burden of proof in this case is on the plaintiff. It is not lightened by the fact that almost twenty-five years elapsed between the time the farm was deeded to Henry G. Syverson and the heirs of the original grantors made an attack upon it. There is no direct evidence of fraud, undue influence, or other wrong on the part of the Syversons. Neither of the original grantors made any move during their lifetime to challenge the deed. The evidence of the attacking heirs fails to produce clear, convincing, and satisfactory proof that the transaction which resulted in the deed from John Hendrickson and his wife to Henry G. Syverson gave rise to a trust, either constructive or resulting.

The defendants and respondents have raised questions of appellate procedure pertaining to the scope of review. Our consideration of those questions is rendered unnecessary by our determination of the case in the respondents' favor on the merits.

The judgment appealed from is affirmed.

GRIMSON, C. J., and SATHRE, JOHNSON and BURKE, JJ., concur.